**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LARAMIE STERLING HINKLE,

    Plaintiff - Appellant,

and

JARROD HINKLE,

    Plaintiff,

v.

BECKHAM COUNTY BOARD OF
COUNTY COMMISSIONERS; SCOTT
JAY, in his individual capacity; STRIDER
ESTEP, Deputy Sheriff, in his individual
capacity,

    Defendants - Appellees.

No. 18-6202

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:15-CV-00497-SLP)**
_____

Brently C. Olsson (Mark S. Rains with him on the briefs), of Cheek Law Firm, PLLC,
Oklahoma City, Oklahoma, for Plaintiff-Appellant, Laramie Hinkle.

Wellon B. Poe (Jamison C. Whitson with him on the brief), of Collins Zorn & Wagner,
P.C., Oklahoma City, Oklahoma, for Defendants-Appellees, Scott Jay and Strider Estep.

Carson C. Smith (Robert S. Lafferrandre with him on the brief), of Pierce Couch
Hendrickson Baysinger & Green, L.L.P., Oklahoma City, Oklahoma, for Defendant-
Appellee, Beckham County Board of County Commissioners.

_____

Before **TYMKOVICH**, Chief Judge, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

A series of coincidences and mistaken beliefs led to the arrest of Laramie Hinkle for possessing a stolen trailer that was not even stolen. And things got worse from there. Despite Hinkle's recently having served as police chief in a nearby Oklahoma town and having voluntarily presented himself for booking, the sheriff's office immediately subjected him to a body-cavity strip search. Soon after that, the sheriff published a press release on his office's website chock full of incriminating allegations from the deputy's arrest-warrant affidavit. After further investigation showed Hinkle innocent, he sued, alleging as unlawful his arrest, the press release, and the body-cavity strip search. We sympathize with Hinkle. But we conclude that the deputy sheriff had probable cause for the arrest, that the deputy arrested Hinkle based on that probable cause, and that the district court did not err in dismissing Hinkle's claim that the sheriff issued the press release to retaliate against Hinkle. That said, we conclude that the body-cavity strip search was unreasonable under the Fourth Amendment. And because this unlawful search was based on the County's indiscriminate strip-search policy, we hold that the County is directly liable. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

### I.    Factual Background

#### A.    The Investigation

On November 6, 2012, Scott Jay defeated a challenger to win re-election as the Beckham County Sheriff. The next day, Laramie Hinkle resigned his office as the Chief of Police for Erick, Oklahoma, situated in Beckham County. Hinkle had supported Sheriff Jay's opponent during the campaign.[1]

In May 2013, Rod and Lynne Smith reported to the Beckham County Sheriff's Office that for the past two weeks someone had abandoned a trailer on their property. Mr. Smith told Deputy Strider Estep that Hinkle or Hinkle's father-in-law, Vaughn Keown, might own the trailer. Keown had recently done some work for the Smiths on their property.

Deputy Estep went to the Smiths' property and viewed the trailer. He wrote down its vehicle identification number (VIN) and information from a trailer-dealership decal. Deputy Estep accessed the National Crime Information Center (NCIC) database, but that revealed nothing suggesting that the trailer had been stolen. Next, after seeing its name on the decal, Deputy Estep called T-N-J Trailers, a South Carolina trailer dealership. A dealership representative told him that the Carpenter's Church in Anderson, South Carolina, had bought the trailer in 2001.

---

[1] Though the timing of Hinkle's resignation might suggest a connection between Hinkle's leaving and Sheriff Jay's victory, Hinkle testified that instead the mayor of Erick had forced him to resign because of a complaint.

Deputy Estep called the church and told its pastor that "a trailer was located in [the] county and that he was trying to discover the owner[.]" Appellant's App. vol. 2 at 391. Deputy Estep described the trailer and provided its VIN. The next day, after "check[ing] into the matter," the pastor called Deputy Estep and confirmed that someone had stolen the trailer "from the church in 2003." *Id.* The pastor also told Deputy Estep that the church's insurer, the Palmetto Insurance Agency, had paid the church's claim for the stolen trailer. Finally, the pastor "asked Deputy Estep if the trailer was in Erick[,] Oklahoma." *Id.* When Deputy Estep confirmed that it was located "just outside Erick," the pastor "informed Deputy Estep that the only persons he could think of that would be in that area who might be in possession of the trailer were Laramie Hinkle or Vaughn Keown"—former members of the Carpenter's Church. *Id.*

With this information, Deputy Estep called the Anderson County Sheriff's Department about the 2003 trailer theft. That office confirmed the theft of a trailer as described but advised that its investigative report did not list a VIN for the trailer stolen from the Carpenter's Church.

Finally, Deputy Estep called the church's insurer, the Palmetto Insurance Agency. Its representative confirmed the pastor's account of the stolen trailer and its having paid the church's claim. Importantly, when Deputy Estep provided the Oklahoma trailer's VIN, the insurer told him that it matched the VIN of the stolen trailer.

4

Armed with this incriminating information, Deputy Estep ran a covert operation. On May 10, 2013, using the name "John Larson," Deputy Estep called Keown, who told him that Hinkle owned the trailer:

> DEPUTY ESTEP: Hey, is this Vaughn?
> VAUGHN KEOWN: Yes
> DEPUTY ESTEP: Hey Vaughn, this is John Larson. I was out there on Lynne Smith's property the other day . . .
> VAUGHN KEOWN: On whose?
> DEPUTY ESTEP: Lynne Smith's, just east of Erick over there.
> VAUGHN KEOWN: Yeah.
> DEPUTY ESTEP: Yeah, hey there's a little trailer out there, a little V-nose white trailer . . .
> VAUGHN KEOWN: Yeah
> DEPUTY ESTEP: Hey, is that yours?
> VAUGHN KEOWN: Umm . . . Now who is this?
> DEPUTY ESTEP: This is John Larson. Can you hear me?
> VAUGHN KEOWN: . . . I don't reckon I know you.
> DEPUTY ESTEP: I'm from over by Cordell, I just do some work for them, just kind of a salesman, but I saw that trailer out there, and they said, uh, you there?
> VAUGHN KEOWN: Yeah, I'm here. Are you interested in buying it or something?
> DEPUTY ESTEP: No, nah, I was just out there the other day, and they said they didn't know whose it was, but they thought it might be yours, and I just was wondering if you were interested in selling that thing?
> VAUGHN KEOWN: Um, I don't know. Actually, my son-in-law owns that. I can ask him.
> DEPUTY ESTEP: Okay. Who's your, is that, Laramie? They said it was either yours or Laramie's.
> VAUGHN KEOWN: Really? Um, man you're breaking up something fierce.
> DEPUTY ESTEP: Alright, hey, let me get to a better spot and I'll call you back.

Appellee's Suppl. App. vol. 1 at 00:10–00:12, 01:24–03:10.

Again using the "John Larson" alias, Deputy Estep called Hinkle to ask about the trailer:

> LARAMIE HINKLE: Hello?
> DEPUTY ESTEP: Is this Laramie?
> LARAMIE HINKLE: Yes, it is.
> DEPUTY ESTEP: Hey, Laramie, this is John Larson, I know ol' Lynne Smith over there in Erick.
> LARAMIE HINKLE: Yes, sir.
> DEPUTY ESTEP: Hey, I was over there the other day and we were just kind of tooling around their property and saw a little V nose trailer out there, about a 16 footer.
> LARAMIE HINKLE: Yes, sir.
> DEPUTY ESTEP: Yeah, hey, they said it might be yours or your father-in-law's, I called your father-in-law, he said it was yours.
> LARAMIE HINKLE: Right.
> DEPUTY ESTEP: And I was wondering if you would be willing to sell that thing.
> LARAMIE HINKLE: Well, let me tell you something, Mark -- I mean, John, let me call you right back, can I get a number from you, I'm right in the middle of something here, and I need to try to take care of it, let me call you right back, okay, partner?
> DEPUTY ESTEP: You there?
> LARAMIE HINKLE: Yes, sir. Can I call you right back? I'm right here in the middle something, I can't really -- let me call you right back, okay, partner?

Appellant's App. vol. 5 at 1105–06. About an hour later, at Deputy Estep's direction, Beckham County Deputy Brett Moore stopped Hinkle's automobile. And about fifteen minutes after that, Deputy Estep arrived and identified himself to Hinkle as the phone caller, "John Larson." Deputy Estep read Hinkle the *Miranda* warning, obtained Hinkle's consent to record their conversation, and began questioning Hinkle about the trailer.

Hinkle immediately told Deputy Estep that he had understood "John Larson" to be asking about a different trailer on someone else's property:

> DEPUTY ESTEP: Okay. All right. Here's the deal, I called your father-in-law.
> LARAMIE HINKLE: Yes.

6

DEPUTY ESTEP: Is that Vaughn?

LARAMIE HINKLE: Yes.

DEPUTY ESTEP: Okay. I described the trailer to him.

LARAMIE HINKLE: Right.

DEPUTY ESTEP: Down there on Lynne's place.

LARAMIE HINKLE: Right, yes, sir.

DEPUTY ESTEP: Okay. And he said you're the one that owned that trailer, okay?

LARAMIE HINKLE: Okay. All right.

DEPUTY ESTEP: Because I'm the one that called and asked if somebody wanted to sell it.

LARAMIE HINKLE: Ok. Sure, sure, okay.

DEPUTY ESTEP: Okay. I described the trailer to him.

LARAMIE HINKLE: Right.

DEPUTY ESTEP: That that V nose trailer that's down there.

LARAMIE HINKLE: Okay. Now, explain to me, you say V nose, explain to me what the --

DEPUTY ESTEP: Just a V.

LARAMIE HINKLE: I know, but is it a cargo trailer or what is it?

DEPUTY ESTEP: It's an enclosed trailer.

LARAMIE HINKLE: Okay. Enclosed trailer, now, that's the part I'm trying to get across.

DEPUTY ESTEP: All right. All right. And I talked to him and described the trailer to him, he said you were the one that owned it.

LARAMIE HINKLE: Yes, sir.

DEPUTY ESTEP: Okay. Then I called you, you know, kind of described it to you, asked you if you were the one that owned it, and you said yeah.

LARAMIE HINKLE: No, no, wait a minute now, I'm thinking you were talking about a flatbed trailer that I had over here. I misunderstood.

DEPUTY ESTEP: Okay. Well, I told you the one over at Lynn's house, I kind of described it to you on the -- I got it on recording.

LARAMIE HINKLE: Okay. Well, that's fine, if you got a recording, but I'm telling you, I don't own an enclosed trailer, I own a flatbed trailer.

DEPUTY ESTEP: Okay.

LARAMIE HINKLE: I don't even own that, I own one trailer in South Carolina and have a flatbed over here at Ms. Branson's (ph) neighbors'.

DEPUTY ESTEP: All right. Well, I'm going based off what you said to me and what your father-in-law said to me, okay.

LARAMIE HINKLE: Okay.

Appellant's App. vol. 5 at 1218–20. Later at his deposition, Hinkle explained that his

uncovered, flatbed, V-nosed trailer was located "a little over a quarter of a mile

from" where the covered, V-nosed trailer was located, and that his trailer "looked similar to it." *Id.* at 1080.[2] Further, Hinkle asserted that, in fact, he had only borrowed the flatbed trailer from one of his friends.

After Hinkle told his side of the story, Deputy Estep and Hinkle called Keown and asked that he come discuss the matter. This time, Keown said that the covered trailer was a "family trailer," that "we all bought it kind of together" from the Carpenter's Church, and that Hinkle "didn't have anything to do with it." Appellee's Suppl. App. vol. 3 at 07:28–07:52. Keown said that he was thirty minutes away and would come meet with Deputy Estep and Hinkle.

Over the next three hours, Deputy Estep called Keown at least three times, with Keown reporting each time that he remained lost in the "Breaks." Appellant's App. vol. 2 at 392, 477–78. Getting nowhere, Deputy Estep testified that he called Assistant District Attorney Gina Webb. After hearing Deputy Estep's account, Prosecutor Webb advised him that he had probable cause to arrest Hinkle.[3] Without

---

[2] Nothing in the record reveals whether Deputy Estep ever saw Hinkle's flatbed trailer; apparently Deputy Estep knew about only one trailer. Appellant's App. vol. 5 at 1041 ("Well, I told you the *one* over at Lynn[e]'s house . . . ." (emphasis added)). Because Hinkle testified that his trailer was a quarter of a mile away from the one on the Smiths' property, it appears that Deputy Estep did not learn about the flatbed trailer until Hinkle said that Deputy Estep had the wrong trailer. Prosecutor Gina Webb testified that "there was only one trailer on [the Smiths'] property at that time." Appellant's App. vol. 4 at 852.

[3] Prosecutor Webb's testimony varied. First, she stated that she had spoken with Sheriff Jay, not Deputy Estep. But she later said that she thought "it was Strider [Estep] that called me first" and that she and he had discussed "probable cause." Appellant's App. vol. 3 at 609. Whenever Sheriff Jay and Prosecutor Webb spoke,

8

seeking or obtaining a warrant, Deputy Estep arrested Hinkle for three crimes—knowingly receiving or concealing stolen property, transporting stolen property into Oklahoma, and conspiracy to commit a felony.

In his opening brief, Hinkle asserts that Deputy Estep, in coordination with Sheriff Jay, framed and arrested him, solely for Hinkle's having supported Sheriff Jay's election opponent. Indeed, Hinkle claims that Sheriff Jay himself made the "decision to arrest Hinkle." Appellant's Opening Br. 8. But the district court found that Sheriff Jay had played only a "passing role," noting that Deputy Estep's investigation had begun when the Smiths—and not Sheriff Jay—called him. Appellant's App. vol. 6 at 1412. The court stated that Hinkle had provided "nothing beyond [his own] suspicions" to show that Deputy Estep had framed him at Sheriff Jay's prompting. *Id.* at 1412, 1415.

Hinkle testified that, after the arrest, a different officer transported him to the Beckham County Detention Center (BCDC), but left him out front so the officer could respond to a report of a fleeing suspect.[4] After voluntarily entering the BCDC,

some of the information Sheriff Jay gave her was incorrect. Prosecutor Webb testified that Sheriff Jay told her the trailer "came back stolen on the NCIC" hit, which is refuted by Deputy Estep's probable-cause affidavit. Appellant's App. vol. 5 at 1148.

[4] In contrast, Deputy Estep testified that he transported Hinkle to the BCDC and "walked him in and filled out the paperwork." Appellant's App. vol. 4 at 825. In reviewing the district court's grant of summary judgment, we credit Hinkle's account. *Genberg v. Porter*, 882 F.3d 1249, 1253 (10th Cir. 2018) ("On an appeal from a grant of summary judgment, we draw all reasonable factual inferences in favor of the non-moving party." (citation omitted)).

9

Hinkle encountered Detention Officer Jason Atwood, who patted him down in the booking area. Immediately after that, Officer Atwood took Hinkle into a private dressing room for a body-cavity strip search. As mandated by the BCDC's strip-search policy[5] applying to all detainees, Officer Atwood directed Hinkle to lift his scrotum and, soon after, to "spread his buttocks, and squat and cough." *Id.* at 1408. During this search, Officer Atwood visually inspected Hinkle's anal cavity from "a couple [of] feet away." Appellant's App. vol. 2 at 331. The body-cavity search lasted a minute or two. Then, wearing rubber gloves, Officer Atwood ran his fingers through Hinkle's beard, again checking for contraband. Officer Atwood testified that the BCDC performed these searches on all incoming detainees before booking them or knowing where they would be housed.

After the body-cavity strip search, Officer Atwood led Hinkle from the private dressing room and handcuffed him to a bench in the booking area. Captain Bilbo, who was "in charge of the jail," testified that this meant that at this time, "they had not made a decision on where he was going to be housed." *Id.* at 361, 367. About an hour later, "because [Hinkle] was the [former] police chief," the sheriff's office transported Hinkle to the Elk City jail to avoid placing him in the BCDC's general population. *Id.* at 326.[6] According to the Beckham County Board of County

---

[5] The County describes the strip-search protocol as a policy.

[6] The distance between the Elk City jail and the BCDC is 17.2 miles. *See Oklahoma Atlas & Gazetteer* 38–39 (6th ed., DeLorme 2019). We take judicial notice of this distance. *See* Fed. R. Evid. 201(b), (c); *Citizens for Peace in Space v. City of*

Commissioners (County), "the decision was made to transfer Plaintiff to Elk City to completely segregate him from the rest of the facility because he was a former law enforcement officer." Appellee Beckham Cty. Bd. of Cty. Comm'rs Resp. Br. 7. Detention Officer Atwood testified that Captain Bilbo would have made the decision to transfer Hinkle, and that "[e]ither she knew ahead of time that he was coming in or one of us would have called her and discussed it with her." Appellant's App. vol. 2 at 327. Captain Bilbo, on the other hand, testified that she had no "recollection of the[se] events," because she was "on medical leave" and "not doing any work at all." *Id.* at 366.

## B. The Case Unravels

On May 14, 2013, just four days after Hinkle's arrest, an agent working for Palmetto Insurance drafted a letter addressed "[t]o whom it may concern." Appellant's App. vol. 5 at 1318 (capitalization removed). The letter began by verifying that on October 23, 2003, a trailer was stolen from the Carpenter's Church. But what the letter said next undid Deputy Estep's case. The letter advised that in 2003 the church had owned *two* Haulmark trailers, and that Palmetto Insurance had now realized that it had mixed the two VINs in processing the stolen-trailer paperwork. The news was dire—Palmetto Insurance had "mistakenly reported the wrong VIN# as stolen" and would "be processing a correction." *Id.* The letter

---

*Colorado Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007); *United States v. Piggie*, 622 F.2d 486, 488 (10th Cir. 1980).

11

summed up "that the trailer currently in possession of Mr. Laramie Hinkle" in fact "was NOT stolen." *Id.*

On May 21, 2013, the Carpenter's Church drafted its own letter addressed "[t]o whom it may concern" "to verify that Vaughn Keown [i]s the rightful owner of the trailer [the trailer in Oklahoma that Deputy Estep had called about]." Appellant's App. vol. 3 at 708. The church's letter advised that Vaughn Keown had "purchased the trailer from The Carpenter's Church in November, 2008." *Id.*[7]

Deputy Estep testified that about "two to three weeks" after Hinkle's arrest (so sometime between about May 24 to June 1, 2013), a Palmetto Insurance representative called him. *Id.* at 524. The representative told Deputy Estep that the VIN of the church's stolen trailer *did not* match the VIN of the Oklahoma trailer. Deputy Estep testified that he "contacted the D.A.'s office immediately" after hearing about the "grave mistake." *Id.* at 522. Prosecutor Webb testified to the contrary, saying that she never received a phone call from Deputy Estep informing her "that the trailer in question was not stolen[.]" Appellant's App. vol. 5 at 1150.

On May 31, 2013, Palmetto Insurance's representative faxed to Deputy Estep a 2013 supplemental report generated by the Anderson County Sheriff's Office

---

[7] We are uncertain of the date that the Beckham County Sheriff's Office received either letter. We note that both letters have remnants of fax transmissions: both show "No. 5965," the Palmetto Insurance letter shows "P. 2" and the Carpenter's Church letter shows "P. 3," and each shows transmission "May 21, 2013 10:12 AM." Appellant's App. vol. 3 at 707–08. On summary-judgment review, and considering the earlier communications between Deputy Estep and the two letter writers, we see a fair inference that the sheriff's office had both letters on May 21, 2013, and it faxed them elsewhere at 10:12 a.m.

concerning the stolen trailer's VIN. As mentioned, the Anderson County Sheriff's Office had no VIN listed in its 2003 incident report for the church's stolen trailer. But in May 2013, after talking with the Palmetto Insurance representative, Deputy Nancy Hunt of the Anderson County Sheriff's Office "went to the old NCIC files" and "obtain[ed] the vin # that was entered into NCIC" for the stolen trailer. Appellant's App. vol. 2 at 382. As revealed in the supplemental report, Deputy Hunt saw that the VIN number the Anderson County Sheriff's Office had entered differed from the VIN of the trailer in Oklahoma. Deputy Estep testified that he "believe[d] [he] would have" received the Palmetto Insurance's representative's May 31 fax. Appellant's App. vol. 4 at 813. Nonetheless, Deputy Estep also testified that he could not "really remember receiving this." Appellant's App. vol. 3 at 545.

Deputy Estep testified that "on his way out" of the Beckham County Sheriff's Office (he resigned on July 8, 2013), he "explained to Sheriff Jay the situation[,] . . . told him where everything was," and told him "that there was conclusive evidence" that Hinkle did not steal the trailer. *See* Appellant's App. vol. 5 at 1139–40. Faced with Deputy Estep's testimony that he had informed Sheriff Jay about Hinkle's innocence "as he was getting ready to leave the department," Sheriff Jay testified that he could not "recall [having] any conversation with him." Appellant's App. vol. 2 at 240–41. But Sheriff Jay also said that he was "not saying it didn't happen." *Id.* at 240.

Furthermore, Sheriff Jay testified that he did not "recall ever seeing" Palmetto Insurance's letter before being deposed on August 14, 2017. *Id.* at 237. Similarly, he

13

claimed that he had "never laid eyes" on the Carpenter Church's letter. *Id.* at 236–37. And Sheriff Jay said that he did not "recall ever seeing [the fax] before." *Id.* at 238.

Despite the exculpatory evidence from the church and its insurer, Prosecutor Webb and the district attorney's office delayed dismissing the case. According to Prosecutor Webb, Sheriff Jay had told her that either the insurance commission or the attorney general's office was investigating the Palmetto Insurance Agency for fraud.

The specifics of any such fraud investigation are unclear. Prosecutor Webb testified that the investigation might have involved the Palmetto Insurance's representative who had spoken with Deputy Estep: "I kind of think that's the lady that they were investigating." Appellant's App. vol. 5 at 1156. Prosecutor Webb could not remember whether she called "the insurance commission or the attorney general's office" in South Carolina about the investigation. *Id.* at 1160–62. But she recalled that a person from one of those offices told her that the investigation had run into "a dead end." *Id.* at 1160. Soon after that conversation, the district attorney's office moved to dismiss the charges against Hinkle. And on September 12, 2013, the state district judge dismissed the case.

## C.     The Press Release

Sometime after Hinkle's arrest, the Beckham County Sheriff's Office posted a press release on its website,[8] entitled "Former Police Officer Arrested for Possessing

---

[8] Neither the district court nor the parties provide a date when the press release was first posted. A time stamp in the record indicates that the press release may first have appeared on the website on August 21, 2013. Because this date would have been

14

Stolen Property." Appellant's App. vol. 3 at 710–11. The press release identified Hinkle's charges and recounted the events leading to his arrest. It stated that the Beckham County Sheriff's Office believed that Hinkle and Keown had "stole[n] a trailer from a church in South Carolina . . . and brought it to Western Oklahoma"; that Hinkle had been "arrested . . . for possession of stolen property, conspiracy to commit a felony, and bringing stolen property into the state"; and that "Hinkle previously served on the Erick Police Department." *Id.* at 710. It claimed that Hinkle had "confirmed that he owned the trailer, according to the report from the Beckham County Sheriff['s] Office." *Id.*

Sheriff Jay testified that he reviewed all press releases before authorizing them to be posted on the Beckham County Sheriff's Office's website. After posting the press release, Sheriff Jay left it on the website for almost two years after the court dismissed Hinkle's charges. In fact, the sheriff never deleted the press release—it remained available to the public until a network crash destroyed all the office's press releases. Nor did Sheriff Jay ever issue a press release about the dismissal of Hinkle's charges.

---

about two months after the Palmetto Insurance representative's call to Deputy Estep exonerating Hinkle, Sheriff Jay may have known that Hinkle was innocent before authorizing posting the press release. But Hinkle does not point out this factual issue and advances no legal theory based on it. In fact, in his Amended Complaint, Hinkle alleges that the press release was posted on May 9, 2013. *See* Am. Compl. ¶ 61. Because "[i]t is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made," *Cordova v. Aragon*, 569 F.3d 1183, 1191 (10th Cir. 2009) (citing *Gross v. Burggraf Construction Co.*, 53 F.3d 1531, 1546 (10th Cir.1995)), we stop here.

15

## II. Procedural Background

Hinkle sued Sheriff Jay, Deputy Estep, and the County under 42 U.S.C. § 1983 for violating his First and Fourth Amendment rights. He also sued Sheriff Jay and Deputy Estep for defamation, for publicly placing him in a false light, and for intentional infliction of emotional distress.

Hinkle alleged that Sheriff Jay, Deputy Estep, and the County had violated his First Amendment rights by retaliating against him for supporting the sheriff's election opponent. As the retaliatory acts, Hinkle relied on the arrest, body-cavity strip search, and press release. In his Fourth Amendment claims, Hinkle asserted that he had been arrested without probable cause and body-cavity strip searched under an unlawful policy. Finally, Hinkle alleged that Deputy Estep and Sheriff Jay had conspired to deprive him of his constitutional rights.

First, the district court dismissed the First Amendment claim on grounds that Deputy Estep had probable cause to arrest Hinkle, that the County's policy of body-cavity strip searching all detainees was lawful, and that the Beckham County Sheriff's Office often released news releases about high-profile cases.

Second, the district court dismissed Hinkle's Fourth Amendment false-arrest claims against Sheriff Jay, Deputy Estep, and the County. As grounds, the district court relied on its earlier conclusion that Deputy Estep had probable cause to arrest Hinkle. The district court relied on many factors, including these: (i) the Smiths had thought Hinkle or Keown owned the trailer, (ii) the church's pastor had confirmed that the trailer was stolen and identified Hinkle and Keown as men who might have

16

the trailer, (iii) the Anderson County Sheriff's Office had agreed that the stolen trailer matched the description of the trailer on the Smiths' property, (iv) the church's insurer had matched the VINs of the stolen trailer and the one on the Smiths' property, and (v) Keown had said that Hinkle owned the trailer. Though the NCIC database did not identify the trailer as stolen, and though Deputy Estep learned before the arrest that Hinkle had earlier understood Deputy Estep to be asking about a different trailer (a flatbed, not a covered trailer), the district court concluded that these countervailing factors did "not vitiate the existence of probable cause." Appellant's App. vol. 6 at 1419–20. Accordingly, the district court dismissed Hinkle's Fourth Amendment false-arrest claims.

Third, the district court dismissed Hinkle's claim that the County, through Sheriff Jay, had implemented an unconstitutional policy requiring body-cavity strip searches of all detainees. Because the BCDC "did not have a true segregation option," the district court ruled that the policy was lawful under *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012). *Id.* at 1425. The court also concluded that Officer Atwood did not violate *Florence*'s touching exception by touching Hinkle's beard—an unclothed area of the body.

Fourth, the district court dismissed Hinkle's claim that Sheriff Jay and Deputy Estep had conspired to deprive him of his constitutional rights. The court stated that "[f]or allegations of conspiracy to successfully constitute a § 1983 claim, a plaintiff 'must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proving one without the other will be insufficient.'" *Id.* at 1427 (citation

17

omitted). And because Hinkle had not shown an actual deprivation of any federally protected right, the court dismissed his civil-conspiracy claim.

After dismissing Hinkle's federal claims, the district court turned to Hinkle's state-law claims. Under 28 U.S.C. § 1367(c)(4), the court chose not to retain supplemental jurisdiction over these claims and dismissed them without prejudice, a decision Hinkle does not appeal.

On appeal, Hinkle challenges only whether the district court properly dismissed his federal claims. We have appellate jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

### I.     The Qualified-Immunity Standard

Deputy Estep and Sheriff Jay successfully asserted qualified immunity against Hinkle's § 1983 claims. We review de novo "the award of summary judgment based on qualified immunity." *Donahue v. Wihongi*, 948 F.3d 1177, 1186 (10th Cir. 2020) (internal quotation marks omitted) (quoting *Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019)).

Qualified immunity insulates "officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). When "a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1212–13 (10th Cir. 2019) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)). To meet that

18

burden, a plaintiff must show "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Donahue*, 948 F.3d at 1186 (internal quotation marks omitted) (quoting *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013)).

Even though a plaintiff bears the burden of meeting these two prongs, a defendant moving for summary judgment "must [still] 'show[] that there is no genuine dispute as to any material fact.'" *Id.* (second alteration in original) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)). And as always, when deciding whether summary judgment is proper, we "may not weigh evidence and must resolve genuine disputes of material fact in favor of the nonmoving party." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (citing *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). In *Tolan*, the Court emphasized "the importance of drawing inferences in favor of the nonmovant" for both prongs of the qualified-immunity analysis. 572 U.S. at 657.

We can affirm the dismissal of Hinkle's claims against Sheriff Jay and Deputy Estep under either prong or both. *See Donahue*, 948 F.3d at 1186 (quoting *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019), *cert. denied sub nom. I.B. v. Woodard*, 139 S. Ct. 2616 (2019)). Here, we rule that Hinkle has not met his summary-judgment burden to show a constitutional violation by Sheriff Jay or

19

Deputy Estep. And because we conclude that Hinkle has not met prong one, he cannot have met his burden under prong two.[9]

## II. Hinkle's Fourth Amendment False-Arrest Claim

Hinkle raises three primary arguments to support his claim that Deputy Estep arrested him without probable cause. First, he claims that Deputy Estep falsely claimed in his arrest affidavit that Hinkle had admitted owning the trailer suspected of being stolen, and he argues that this admission was necessary for probable cause. Second, Hinkle claims that even if Deputy Estep had probable cause that Hinkle was involved with a stolen trailer, Deputy Estep would still have lacked probable cause to arrest, because Oklahoma law requires that the property be *recently* stolen. Third, Hinkle claims that Deputy Estep lacked probable cause to arrest because the statute of limitations had run on each of his charges.

---

[9] Because the County is a governmental entity and not an individual, it is not entitled to the protections of qualified immunity. *E.g.*, *Owen v. City of Indep.*, 445 U.S. 622, 657 (1980) ("[M]unicipalities have no immunity from damages liability flowing from their constitutional violations . . . ."); *Seifert v. Unified Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1159 (10th Cir. 2015) ("Only individuals, not governmental entities, can assert qualified immunity." (citing *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005)). Thus, we do not apply the qualified-immunity standard to Hinkle's claims against the County. Rather, we will review de novo whether the County has shown the absence of a genuine dispute of material fact, "drawing all reasonable inferences and resolving all factual disputes in favor of [Hinkle]." *Murphy v. City of Tulsa*, 950 F.3d 641, 643 (10th Cir. 2019) (internal quotation marks omitted) (quoting *Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014)) (citing Fed. R. Civ. P. 56(a)) (applying the de novo standard of review when reviewing a district court's grant of summary judgment in favor of the City of Tulsa on a plaintiff's municipal-liability claim).

20

### A.    Probable Cause

Probable cause is a concept "incapable of [a] precise definition or quantification into percentages." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). But an officer must have probable cause to obtain a warrant—the Constitution states that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Probable cause also remains important outside of the warrant context, because "[a] warrantless arrest is permissible when an officer 'has probable cause to believe that a person committed a crime.'" *E.g.*, *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

In reviewing "whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted) (quoting *Pringle*, 540 U.S. at 371). Such facts amount to probable cause "when [they] . . . are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Cortez*, 478 F.3d at 1116 (internal quotation marks omitted) (quoting *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004)). That belief must be anchored in a "substantial probability"—as opposed to "a bare suspicion"—that an offense took or

21

is taking place. *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (internal quotation marks omitted) (quoting *Stonecipher*, 759 F.3d at 1141).

But probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (citations omitted). Officers need "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (internal quotation marks and alterations omitted) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). For that reason, in considering whether the government has shown probable cause to indict, grand juries need not hear the defendant's side of an argument, *id.* (citing *United States v. Williams*, 504 U.S. 36, 51 (1992)), any cross-examination of the prosecution's witnesses, *id.* (citing *Gerstein v. Pugh*, 420 U.S. 103, 121–22 (1975)), or any exculpatory evidence, *id.* (citing *Williams*, 504 U.S. at 51)—a reasonably prudent person could find that the low bar of probable cause was met without technical analysis. Formulation of probable cause "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt." *Gerstein*, 420 U.S. at 121 (citation omitted). An officer's subjective state of mind is irrelevant to the probable-cause calculus because the crux of the inquiry is whether "the circumstances, viewed objectively, justify [the arrest]." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (internal quotation marks omitted) (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)).

Temporally, we judge probable cause to arrest by what facts the officer knew at arrest. *Id.* at 152 (citing *Pringle*, 540 U.S. at 371); *see also United States v. Neal*, 500 F.2d 305, 309 (10th Cir. 1974). Information learned after developing probable cause but before an arrest can dissipate probable cause. *E.g.*, *United States v. Dalton*, 918 F.3d 1117, 1128 (10th Cir. 2019) ("[N]ew information can dissipate probable cause." (citing *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1182 (10th Cir. 2017) (per curiam) (opinion of Phillips, J.) (joined by Lucero, J.) (other citations omitted));[10] *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) ("A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated."); *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) ("As a corollary, moreover, of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." (footnote and citations omitted)). And in reviewing the dissipation question, courts impute officers "with knowledge of any readily available exculpatory evidence that they unreasonably fail to ascertain." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1310 (10th Cir. 2015) (internal quotation marks and citation omitted).

Though officers may not ignore evidence that would dissipate probable cause, not all new evidence does so. For instance, a soon-to-be arrestee's bare proclamations

---

[10] Whether reviewing a search or an arrest, the same probable-cause standard applies. *See Stonecipher*, 759 F.3d at 1141 ("Officers must have probable cause to initiate a search, arrest, and prosecution under the Fourth Amendment.").

of innocence do not. *Romero*, 45 F.3d at 1480 (citations omitted) ("Once Defendants concluded that the initially discovered facts established probable cause, they were under no obligation to forego arresting Plaintiff or release him merely because he said he was innocent."). Even "a plausible explanation" does not require "the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Id.* at 1480 n.6 (quoting *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988)). In the comparable context of whether an arresting officer must release an already-detained suspect to avoid a false-imprisonment claim, the First Circuit has reasoned that "having once determined that there is probable cause to arrest, an officer should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car." *Thompson v. Olson*, 798 F.2d 552, 556 (1st Cir. 1986). Instead, arresting officers must release a suspect only if the police discover that "the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded." *Id.* (citing Restatement (Second) of Torts § 134 cmt. f (Am. Law Inst. 1965)).

## B. Deputy Estep Had Probable Cause to Believe that Hinkle Was Involved in Crimes Connected to a Stolen Trailer.

Applying this framework, we agree with the district court that, at the time of Hinkle's warrantless arrest, Deputy Estep had probable cause that Hinkle had committed a crime. An objectively reasonable officer standing in Deputy Estep's place would have plentiful information from reputable sources to support a

24

substantial probability that Hinkle had stolen, helped steal, helped conceal, or wrongfully received the trailer left on the Smiths' property.

As mentioned, Deputy Estep investigated for two weeks, obtaining incriminating information along the way from neutral, credible sources—the Smiths, the Carpenter's Church pastor, the Anderson County Sheriff's Office, and Palmetto Insurance. The reported VIN match alone furnished probable cause that the trailer was stolen.

Further, Deputy Estep had probable cause to attribute that crime to Hinkle. Both the Smiths and the pastor named Hinkle and Keown as men who might have the trailer, and Keown first stated that Hinkle owned the trailer. When Deputy Estep told Hinkle of Keown's statement, Hinkle did not protest, but just followed along by uttering "right." Finally, after Deputy Estep later confronted Keown about his initial statement, Keown still described the trailer as a "family trailer." And Hinkle was family—he was Keown's son-in-law.[11]

These facts gave Deputy Estep probable cause to believe that Hinkle had committed a crime. Indeed, Hinkle was charged with "conspiring and agreeing with Vaughn Keown to" knowingly conceal stolen property. Appellant's App. vol. 3 at 697. A criminal conspiracy takes two or more people, *United States v. Keck*, 643 F.3d

---

[11] Keown's changing story also would have given Deputy Estep reason to question Keown's veracity. *Cf.* 1 McCormick on Evidence § 34 (8th ed. Jan. 2020 update) ("[T]he fact of the inconsistency gives the jury an insight into the witness's state of mind; the inconsistency shows that the witness is either uncertain or untruthful. In either event, the inconsistency calls into question the witness's believability.").

789, 793 (10th Cir. 2011) (citing *United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992)), and Deputy Estep had a reasonable basis to believe that Keown and Hinkle were coconspirators. They were family members, they both had attended the Carpenter's Church in South Carolina, and they both were tied to the trailer by the Smiths and the pastor.

Accordingly, we conclude that Deputy Estep had probable cause to believe that a crime was being committed and that Hinkle was one of the people committing the crime.

### C. Deputy Estep Had Probable Cause Even Without Hinkle's Confirmation of Ownership, and That Probable Cause Never Dissipated.

Hinkle asserts that "Estep . . . mischaracterize[d] Hinkle's statement of 'Right' to be an affirmative statement of ownership." Appellant's Opening Br. 27. He also claims that because "John Larson" did not clarify whether he was asking Hinkle about a covered trailer or a flatbed trailer, Hinkle's responding "right" was not a claim of ownership. Hinkle argues that "[w]ithout the 'Right' there is nothing indicating Hinkle had any possession of the trailer." *Id.* at 31.

We disagree. Even without Hinkle's utterance of "right," the reported match of VINs gave Deputy Estep probable cause to believe that a crime had been committed. And even without "right," Deputy Estep still had probable cause to believe that Hinkle had committed that crime because the Smiths, the pastor, and Keown had connected him to the trailer.

26

Further, Hinkle's later explanation that he had originally been referring to a different trailer—a flatbed one—did not dissipate probable cause. As discussed, even "a plausible explanation" does not oblige "the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Romero*, 45 F.3d at 1480 n.6 (quoting *Criss*, 867 F.2d at 263). Hinkle may have thought Deputy Estep was referring to a different trailer when Hinkle uttered "right," but that would not diminish the other evidence Deputy Estep relied on in arresting Hinkle.

**D.** **Recently Stolen Property Is Not an Element of Any of Hinkle's Charges.**

Next, Hinkle argues that Deputy Estep lacked probable cause to arrest him because his suspected crimes required that the trailer have been *recently* stolen. Further, Hinkle disputes that "Estep . . . objectively establish[ed] that Hinkle had knowledge the trailer in question was stolen." Appellant's Opening Br. 26–27 (citations omitted). He also claims that Deputy Estep made an unreasonable mistake of fact and that his mistake "cannot furnish probable cause." *Id.* at 27 (citations omitted). We disagree.

The Information charged Hinkle with knowingly concealing stolen property, in violation of title 21, section 1713 of the Oklahoma Statutes, conspiring to knowingly conceal stolen property, in violation of title 21, section 421 of the Oklahoma Statutes, and transporting stolen property into the state, in violation of title 21, section 1715 of the Oklahoma Statutes. We disagree with Hinkle that Deputy Estep would have lacked probable cause to arrest Hinkle for these crimes absent evidence that the

27

trailer had been recently stolen. Okla. Stat. Ann. tit. 21, § 1713A (West 2003), states

that:

> Every person who buys or receives, in any manner, upon any consideration, any personal property of any value whatsoever that has been stolen, embezzled, obtained by false pretense or robbery, knowing or having reasonable cause to believe the same to have been stolen, embezzled, obtained by false pretense, or robbery, or who conceals, withholds, or aids in concealing or withholding such property from the owner, shall be guilty of a felony.

This statute does not require that the property be recently stolen. If Hinkle had

received the trailer, believing that Keown had stolen it,[12] or if Hinkle had aided

Keown in concealing the trailer, he would have violated section 1713A.

In an attempt to write a recently-stolen element into the statute, Hinkle cites

*Jackson v. State*, 508 P.2d 277, 279–80 (Okla. Crim. App. 1973), and *Miller v. State*,

481 P.2d 175, 178 (Okla. Crim. App. 1969), for the proposition that under section

1713A, "mere possession of property *recently stolen alone* is not sufficient to convict

the possessor of knowingly concealing stolen property." Appellant's Opening Br. 26.

---

[12] Because receiving or concealing stolen property are accessory crimes, many courts reason that "[a] person cannot be convicted of receiving stolen property where the evidence shows that he acted as a principal in the underlying larceny." Charles E. Torcia, 3 Wharton's Criminal Law § 440 (15th ed. Sept. 2019 update) (collecting cases). So if Hinkle stole the trailer himself, these accessory crimes may not be applicable. But if that were the case, Hinkle could be charged with the underlying larceny crime. Because "the probable cause inquiry is not restricted to a particular offense, but rather requires merely that officers had reason to believe that a crime—any crime—occurred," *United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009) (citing *Devenpeck*, 543 U.S. at 153), we conclude that the ultimate probable-cause inquiry is not affected by whether Deputy Estep thought Hinkle or Keown stole the trailer.

28

That language comes from an aged[13] jury instruction, for which *Jackson* and *Miller* reviewed challenges that it improperly placed the burden of producing evidence on defendants. *Jackson*, 508 P.2d at 280; *Miller*, 481 P.2d at 178. But neither case grafted a recently-stolen-property element into the statute. Nor will we. *See* tit. 21, § 1713A; *see also Eslinger v. State*, 734 P.2d 830, 832 (Okla. Crim. App. 1987) ("The essential elements of the crime of Knowingly Concealing Stolen Property are knowledge that the property was stolen and the act of concealing the property in some manner from the rightful owner." (citation omitted)); *Brewer v. State*, 554 P.2d 18, 21 (Okla. Crim. App. 1976) (citations omitted) (listing the elements for receiving stolen property and concealing stolen property but omitting from both lists a requirement that the property be recently stolen).

Hinkle also argues that Deputy Estep lacked probable cause that Hinkle knew the trailer was stolen. We agree with Hinkle that Deputy Estep needed to develop probable cause for each element of the offense. *See Donahue*, 948 F.3d at 1188 n.14 ("[A] court can 'determin[e] whether an officer had probable cause to make an arrest for a violation of state law' by 'applying the Fourth Amendment standard' to the 'identif[ied] . . . elements of a crime, based on state law.'" (omission and second and

_____

[13] The current Oklahoma Uniform Jury Instructions do not include a recently-stolen element for the crime of receiving-stolen property. Vernon's Okla. Forms 2d, OUJI-CR 5-111 (Nov. 2018 update) (emphasis removed). And why this language appeared in earlier jury instructions is unclear—the earlier versions of this statute did not include a recently-stolen-property element, either. *See* Okla. Stat. Ann. tit. 21, § 1713A (1988) (referencing a historical note that quotes a pre-1961 version, which, like the current version, includes no recently-stolen-property element).

third alterations in original) (quoting Ivan E. Bodensteiner and Rosalie Berger Levinson, 1 State and Local Gov't Civ. Rights Liab. § 1:11 (Nov. 2019 update))).[14] But for the reasons mentioned, we conclude that Deputy Estep had probable cause that Hinkle knew that the trailer was stolen (even though it turned out that it was not).

In this case, Deputy Estep relied on information he received from unbiased sources. That information led him to believe that Hinkle and his father-in-law had possessed the trailer. If that were true, Deputy Estep could reasonably have believed that Hinkle knew the trailer was stolen. And though the church and insurance

---

[14] The majority position among our sister circuits is that an arrest is supported by probable cause only if the arresting officer has probable cause for every element of the offense. *Williams v. City of Alexander*, 772 F.3d 1307, 1312 (8th Cir. 2014) ("For probable cause to exist, there must be probable cause for all elements of the crime, including *mens rea*." (citing *Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir. 1999))); *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013) ("To make an arrest based on probable cause, the arresting officer must have probable cause for each element of the offense." (citing *Wright v. City of Philadelphia*, 409 F.3d 595, 602–03 (3d Cir. 2005))); *Thacker v. City of Columbus*, 328 F.3d 244, 256 (6th Cir. 2003) ("Thus, for probable cause to arrest Thacker to exist here, the officers would not have to have proof of each element of a domestic violence offense, but would have to believe that a probability existed that he committed the offense."); *see also Hall v. District of Columbia*, 867 F.3d 138, 154 (D.C. Cir. 2017) ("Probable cause to arrest requires at least some evidence supporting each element of the offense."). *But see Spiegel v. Cortese*, 196 F.3d 717, 724 n.1 (7th Cir. 1999), *as amended* (Jan. 7, 2000) (stating that officers need not "establish probable cause as to *each and every* element of a crime before they are authorized to make an arrest"); *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (announcing that officers must have probable cause of specific intent for specific-intent crimes but that they need not have probable cause for other elements (citing *United States v. Thornton*, 710 F.2d 513, 515 (9th Cir. 1983); *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 705 (9th Cir. 1989), *overruled on other grounds by Act Up!/Portland v. Bagley*, 988 F.2d 868, 872–73 (9th Cir. 1993))).

company later retracted their information as mistaken, Deputy Estep reasonably relied on it before the arrest. Thus, we conclude that Deputy Estep had probable cause to arrest Hinkle.

###### E. Because the Charges Were for Continuing Crimes, the Statute of Limitations Had Not Run.

Finally, Hinkle argues that a three-year statute of limitations applies to the suspected Oklahoma property and conspiracy crimes. *See* Okla. Stat. Ann. tit. 22, § 152G (West 2003) ("In all other cases a prosecution for a public offense must be commenced within three (3) years after its commission."). Because the Carpenter's Church reported the trailer stolen in 2003, and he was arrested in 2013, Hinkle claims that the statute of limitations had run on each charge. Thus, Hinkle asserts that Deputy Estep had no probable cause to arrest him.

Hinkle's argument rests on the mistaken position that the statute of limitations began to run when the Carpenter's Church reported the trailer as stolen. As a general rule, criminal statutes of limitations begin to run, at the earliest, when a wrongful act is completed, not when the victim later recounts the wrongful act to others. *United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995) ("The limitations period will normally begin to run when a crime is 'complete,' thereby 'encouraging law enforcement officials promptly to investigate suspected criminal activity.'" (citation omitted)); 22A C.J.S. *Criminal Procedure and Rights of Accused* § 596 ("[N]ormally a statute of limitation begins to run from the time the crime is complete . . . .").

31

Courts, including the Oklahoma Court of Criminal Appeals, treat crimes such as receiving or concealing stolen property as continuing crimes, whose statutes of limitations do not commence until wrongful possession or concealment ends. *See, e.g.*, *United States v. Blizzard*, 27 F.3d 100, 102 (4th Cir. 1994) ("[T]he nature of the offense of knowingly concealing and retaining stolen government property, nevertheless, convinces us that Congress intended for that offense to be a continuing one."); *People v. Owen*, 649 N.W.2d 777, 780 (Mich. Ct. App. 2002) ("'Conceal,' in particular, clearly implies continuing conduct, because in concealing something, one is continually keeping it hidden from others."); *State v. Lawrence*, 312 N.W.2d 251, 253 (Minn. 1981) ("We hold, therefore, that either concealing or possessing stolen goods is a continuing offense for the purpose of the statute of limitations."); *Hainey v. State*, 740 P.2d 146, 149 (Okla. Crim. App. 1987) ("Concealing stolen property is a continuing offense.").[15] Because Hinkle was charged with continuing crimes, the statute of limitations did not commence until Deputy Estep seized the trailer on May

---

[15] Hinkle also argues that he was subjected to an unreasonable continuing seizure under the Fourth Amendment because his arrest led to his having to post a bond and attend court proceedings. But because Deputy Estep had probable cause to arrest Hinkle, we need not decide whether these pretrial inconveniences amount to seizures unsupported by probable cause. *Cf. Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017) (explaining that if the original arrest was "without probable cause," a plaintiff's subsequent detention is "constitutionally unreasonable" because both the detention and the original arrest were "unsupported by probable cause"). Indeed, under our precedent, posting a bond and attending court proceedings may not even constitute seizures. *See Becker v. Kroll*, 494 F.3d 904, 915 (10th Cir. 2007) (declining to adopt Justice Ginsburg's concurring approach in *Albright v. Oliver*, 510 U.S. 266 (1994), which suggested that the term *seizure* is broad enough to cover posting a bond or attending pretrial court proceedings).

10, 2013, terminating Hinkle's alleged possession and concealment of the trailer. As a result, the three-year statute of limitations had not yet run when Deputy Estep arrested Hinkle on that day. So even if Deputy Estep had needed to consider the statute of limitations—a dubious proposition in and of itself, *see Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007); *Pickens v. Hollowell*, 59 F.3d 1203, 1207–08 (11th Cir. 1995)—that would not have affected the probable-cause analysis.

F. **Because the False-Arrest Claim Against Deputy Estep Fails, Hinkle's Derivative False-Arrest Claims Against Sheriff Jay and the County Fail.**

Hinkle claims that Sheriff Jay, as the County's "final policy maker" and Deputy Estep's supervisor, can be held liable for ratifying Hinkle's false arrest. Appellant's Opening Br. 19. To establish liability against a supervisor under § 1983, Hinkle must show "a deliberate, intentional act by the supervisor to violate constitutional rights." *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) (internal quotation marks omitted) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992)). He may do so by showing that Sheriff Jay "personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance." *Id.* (citing *Woodward*, 977 F.2d at 1400). Because Deputy Estep committed no constitutional violation, Hinkle cannot show that Sheriff Jay directed Deputy Estep to commit a constitutional violation or that Sheriff Jay acquiesced in its continuance. Hinkle's supervisory claim thus fails.

As for the County, Hinkle admits that "municipal liability under Section 1983 requires in the first instance, under *Monell v. Dep't Soc. Servs*, 436 U.S. 658, 692

(1978), that the municipality's policy caused a constitutional violation." Appellant's Opening Br. 41. Hinkle has failed to show that the County, through Sheriff Jay, had adopted a policy sanctioning unlawful warrantless arrests. But even if he had done so, Hinkle's *Monell* claim would fail because he was arrested with probable cause. *See Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.").

## III.    Hinkle's First Amendment Retaliation Claim

We now turn to Hinkle's argument that Deputy Estep and Sheriff Jay retaliated against him for exercising his First Amendment rights by supporting Sheriff Jay's opponent in the 2012 election. Hinkle must establish three elements to show First Amendment retaliation:

> (1) that [he] was engaged in constitutionally protected activity; (2) that the defendant[s'] actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant[s'] adverse action was substantially motivated as a response to [his] exercise of constitutionally protected conduct.

*Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (internal quotation marks and citation omitted). Deputy Estep and Sheriff Jay concede that for purposes of summary judgment, "Hinkle's allegations . . . involving political support/association and suffrage [are] sufficient for the first element of 'constitutionally protected activity.'" Appellees Scott Jay and Strider Estep's Response Br. 19. They also agree that "an arrest or the publication of a press release regarding that arrest could satisfy

34

the second prong." *Id.* Thus, Sheriff Jay and Deputy Estep limit their arguments to the third element.

Hinkle's First Amendment retaliation claim has two bases: (1) that Deputy Estep arrested him in retaliation for supporting Sheriff Jay's election opponent, and (2) that Sheriff Jay posted a false press release and sanctioned criminal charges against Hinkle for the same reason.[16]

## A. Arrest

In addition to the three *Worrell* elements, a First Amendment retaliation claim based on a false arrest requires a separate "threshold showing"—generally, a plaintiff must show a false arrest. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). Hinkle concedes that "[w]hen an unlawful arrest is at the heart of a First Amendment retaliation claim, such as here, a lack of probable cause must be shown." Appellant's Opening Br. 32 (citation omitted). And in *Nieves*, the Supreme Court recently explained that "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." 139 S. Ct. at 1724. The *Nieves* Court adopted this objective test of probable cause to avoid an unwelcome result of using an officer's subjective state of mind: "[a]ny inartful turn of phrase or perceived slight during a legitimate arrest could land an officer in years of litigation." *Id.* at 1725. A subjective-mindset test could subject officers to suit despite an arrestee's legitimate

---

[16] Thus, on appeal Hinkle does not contend that he was strip searched in retaliation for his First Amendment activity.

arrest and despite the Fourth Amendment's "objective standard[] of reasonableness." *Id.* (citations omitted).

We have already concluded that Deputy Estep had probable cause to arrest Hinkle. So, under *Nieves*, Hinkle's retaliatory-arrest claim must fail. And though *Nieves* carves out a narrow exception—that probable cause will not defeat a retaliatory-arrest claim if the plaintiff could show that officers would usually not arrest under similar circumstances, *id.* at 1727, Hinkle has not argued that officers would forego arrests under his circumstances.[17]

### B.     Press Release

Hinkle also alleges that "Jay amped up the retaliation against Hinkle by overseeing the publication and dissemination of . . . false information through a Press Release detailing Hinkle's arrest." Appellant's Opening Br. 35. As mentioned, Sheriff Jay has conceded that Hinkle established the first two *Worrell* elements for purposes of summary judgment; thus, the sole question before us is whether Sheriff Jay's "adverse action was substantially motivated as a response to [Hinkle's] exercise of constitutionally protected conduct." *Worrell*, 219 F.3d at 1212 (internal quotation marks and citation omitted).

The district court concluded that Hinkle had failed to demonstrate this was so. It noted that Hinkle had "not provided anything except suspicions and a

---

[17] As an example, if officers have a practice of never arresting people for jaywalking but then do arrest a plaintiff for jaywalking after he or she has complained about the police, a possible retaliatory-arrest claim could survive, probable cause notwithstanding. *Nieves*, 139 S. Ct. at 1727.

36

chronological connection (as opposed to a causal connection) between [Hinkle's] support of [the opponent] and issuance of the news release regarding [Hinkle's] arrest." Appellant's App. vol. 6 at 1413. It also credited Sheriff Jay's testimony that "the news release [w]as 'part and parcel of law enforcement activity' and 'common practice.'" *Id.* Finally, the court concluded that Hinkle had presented "no specific evidence of [Sheriff Jay]'s culpable state of mind." *Id.* at 1415 (alteration in original) (internal quotation marks and citations omitted). And even if he had, the court reasoned that Hinkle had not cited "support for the proposition that there exists a constitutional or statutory right to prevent one's arrest information from being disclosed publicly." *Id.*

On appeal, Hinkle does little to contest the district court's analysis. Hinkle claims that Sheriff Jay must have been targeting him because an "alleged theft of a trailer going back 10 years is hardly a 'high profile' crime spree deserving of being blasted out on the internet by the Sheriff via his website or to media at his direction." Appellant's Opening Br. 38. He also asserts that "the Press Release and its impact cannot be construed in a vacuum. An inference of retaliation via the release is certainly stronger in this case where a *false* Press Release follows immediately on the heels [of] an arrest without probable cause." *Id.* Finally, he argues that this court has "opened the door for consideration" of evidence regarding past instances where Sheriff Jay may have retaliated against other political opponents. *Id.* at 39.

We agree with Hinkle that we must consider surrounding circumstances in evaluating his retaliation claim. But doing so here shows an absence of retaliation:

37

the press release followed an arrest that *was* based on probable cause.[18] Therefore, this case is not one in which "a *false* Press Release follows immediately on the heels [of] an arrest without probable cause." *Id.* at 38.

Second, Hinkle's argument that this was not a high-profile matter fails to acknowledge his status as a former local police chief. Though the alleged crimes are not the most serious ones under Oklahoma law, an arrest of a former police chief is a high-profile arrest.

Finally, Hinkle alleges that in *Gehl Group v. Koby*, 63 F.3d 1528, 1537 (10th Cir. 1995), *implicitly overruled on other grounds by Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001), this court "opened the door" for Hinkle to show that Sheriff Jay's alleged retaliation against others supports his claim that Sheriff Jay retaliated against him as part of a larger pattern of harassing political adversaries. Appellant's Opening Br. 38–39. *Gehl Group* does not support that assertion. In *Gehl Group*, the plaintiffs—two chapters of the Fraternal Order of Police, their solicitation agent, and their regional manager—argued that certain law-enforcement officials and other local officials "filed baseless criminal charges against them and selectively and vindictively prosecuted them" because they were "soliciting charitable contributions

---

[18] As mentioned, Hinkle actually alleges that the press release was somehow posted on May 9, 2013—a day before his arrest. *See supra* note 8 and accompanying text. Because the press release is written in the past tense, we believe that the press release must have been posted sometime after his arrest. If it had been written and posted after Sheriff Jay knew that Hinkle had been exonerated—and after probable cause had dissipated—we would consider this some evidence that Sheriff Jay intended to retaliate against Hinkle. But Hinkle has not presented such a theory.

in the Boulder area." 63 F.3d at 1530. We rejected that contention because the plaintiffs had not "identif[ied] a pattern of harassment from which we might be able to infer [the] [d]efendants' retaliatory motivations." *Id.* at 1537 (citing *W.E.B. DuBois Clubs of Am. v. Clark*, 389 U.S. 309, 312–13 (1967) (per curiam)). That was because they had been "subject[ed] to only a single prosecution." *Id.* And there, we concluded that the prosecution "was supported by probable cause." *Id.*

Likewise, here, Hinkle was arrested once, his arrest was supported by probable cause, and the press release merely reported the details of that lawful arrest. So *Gehl Group* does not support Hinkle's argument—it undermines it. Nor does it support Hinkle's argument that other instances of Sheriff Jay's possible retaliation against others was evidence that he retaliated against Hinkle. *See id.* (considering whether the defendants had treated other groups "in a different manner" to determine if they had "singled [the plaintiffs] out for prosecution").

### C. *Monell* Liability

The district court dismissed Hinkle's First Amendment retaliation claim against the County because it had already ruled that Sheriff Jay and Deputy Estep had not violated Hinkle's First Amendment rights. *See Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155–56 (10th Cir. 2001) ("[T]he City cannot be held liable where, as here, the officers did not commit a constitutional violation."). Because neither Sheriff Jay nor Deputy Estep violated Hinkle's First Amendment rights, the district court properly dismissed Hinkle's First Amendment claim against the County.

39

## IV. Hinkle's Fourteenth Amendment Stigma-Plus Claim

Hinkle argues that he has also raised a "defamation plus" claim based on the press release and Sheriff Jay's "sanction[ing] of criminal charges." Appellant's Opening Br. at 35–36 (capitalization and emphasis removed). Hinkle alleges that, even though his "defamation plus claim was briefed, it was not analyzed by the district court." *Id.* at 36. We do not fault the district court for not considering this claim, because Hinkle's briefing—both here and in the district court—overlays his First Amendment retaliation analysis with his Fourteenth Amendment stigma-plus analysis.[19] But those analyzes are distinct. *See, e.g.*, *Mattox v. City of Forest Park*, 183 F.3d 515, 521 n.3 (6th Cir. 1999) (explaining that First Amendment retaliation cases differ from defamation cases under the Fourteenth Amendment). Unlike First Amendment retaliation claims, Fourteenth Amendment stigma-plus claims require a plaintiff to prove "that the government has violated the Due Process Clause by damaging its reputation." *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1184 (10th Cir. 2016). Thus, the stigma-plus doctrine exists within the procedural-due-process framework. *See Al-Turki v. Tomsic*, 926 F.3d 610, 614, 617 (10th Cir. 2019). And courts "ask two questions" when considering procedural-

---

[19] Moreover, Hinkle's Amended Complaint does not clearly raise a procedural-due-process claim. Nonetheless, "Count III" of Hinkle's Amended Complaint is titled, "FOURTEENTH AMENDMENT VIOLATION . . . DUE PROCESS." In addition, Hinkle alleges that the press release "exposed [him] to public hatred, contempt, ridicule, and disgrace." Am. Compl. ¶ 106. We will assume that by using this language, Hinkle intended to raise a stigma-plus procedural-due-process claim. *See* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

due-process claims: "(1) Did the plaintiff possess a protected property or liberty interest to which due process protections apply? And if so, (2) was the plaintiff afforded an appropriate level of process?" *Id.* at 614 (internal quotation marks and citation omitted).

In the stigma-plus context, we have recently provided guidance on what a plaintiff must show to satisfy the first element—i.e., a deprivation of a protected property or liberty interest. In *Al-Turki*, 926 F.3d at 617, we said that "[w]hat is needed in addition to stigma . . . is some change in legal status." That "change in status must be 'significant[].'" *Id.* (alteration in original) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)). We ruled that to satisfy the first procedural-due-process element through stigma, plaintiffs must meet two sub-elements: "that (1) the government made a false statement about [the plaintiff] . . . that was sufficiently derogatory to injure his reputation, and that (2) [the plaintiff] experienced a governmentally imposed burden that significantly altered his status as a matter of state law." *Id.* at 618 (alterations and omission in original) (internal quotation marks omitted) (quoting *Gwinn v. Awmiller*, 354 F.3d 1211, 1224 (10th Cir. 2004)). As actions sufficient to satisfy the second sub-element, we have included "the state's taking away the right to operate a vehicle or revoking parole." *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citing *Paul*, 424 U.S. at 711). And in *Gwinn*, we concluded that a plaintiff had satisfied the "'stigma-plus' standard" by alleging that the government had falsely labeled him as a sex offender and further required him "to register as a sex offender." 354 F.3d at 1224 (citing *Paul*, 424 U.S. at 710–

41

11). Registration as a sex offender is "a governmentally imposed burden that 'significantly altered [his] . . . status as a matter of state law.'" *Id.* (alteration and omission in original) (quoting *Paul*, 424 U.S. at 710–11).

Even if we were to conclude that Sheriff Jay defamed Hinkle, Hinkle would still need to satisfy the second sub-element: that he suffered a "governmentally imposed burden that significantly altered his status as a matter of state law." *Al-Turki*, 926 F.3d at 618 (internal quotation marks and citation omitted). In his opening brief, Hinkle states that "the press release was false, and it was coupled with the imminent sanction of Hinkle being subjected to criminal charges." Appellant's Opening Br. 36 (some capitalization removed). Hinkle argues that the collateral hardships defendants face during criminal trials—"humiliation, damage to reputation and a concomitant harm to future employment practices"—are similar to those he faced from having the press release posted on the Beckham County Sheriff's Office's website. *Id.* (citation and internal quotation marks omitted). Thus, as we understand him, Hinkle argues that his "governmentally imposed burden" was humiliation, an injured reputation, and difficulty obtaining future employment.[20]

---

[20] Hinkle's assertion that the press release "was coupled with the imminent sanction of Hinkle being subjected to criminal charges" is temporally inaccurate. Hinkle was, as we have concluded, lawfully arrested and charged *before* Sheriff Jay issued the press release. Further, as discussed, nothing in the record indicates that Sheriff Jay directed Deputy Estep to investigate and arrest Hinkle. Thus, as to the "plus" of Hinkle's stigma-plus claim, we will consider only those alleged deprivations we have identified above—humiliation, an injured reputation, and difficulty obtaining future employment.

42

That is not enough. *See, e.g.*, *Paul*, 424 U.S. at 711 ("[T]he interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the 'liberty' or 'property' [right protected by the Fourteenth Amendment.]"); *Martin Marietta Materials*, 810 F.3d at 1184 ("Damage to reputation alone, however, is not sufficient." (citing *Gwinn*, 354 F.3d at 1216; *Paul*, 424 U.S. at 711–12)); *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 971 (9th Cir. 2010) ("[A]llegations of 'psychological trauma' are not sufficient to satisfy *Paul*'s 'stigma-plus' test." (citing *Rolon v. Henneman*, 517 F.3d 140, 148 (2d Cir. 2008))); *Jensen v. Redev. Agency of Sandy City*, 998 F.2d 1550, 1559 (10th Cir. 1993) ("Damage to prospective employment opportunities is too intangible to constitute deprivation of a liberty interest." (citation omitted)); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989) ("[E]ven if defendants' actions made plaintiff less attractive to employers or clients, that is insufficient to state a deprivation of a liberty or property interest under Section 1983." (citation omitted)). As discussed, Hinkle must show a significant, material change in a legal status—such as losing the right to drive a car or being wrongfully registered as a sex offender. He has failed to do so.

## V. Hinkle's Civil-Conspiracy Claim

Hinkle argues not only that his constitutional rights were violated, but that they were violated through a conspiracy. Specifically, Hinkle asserts that "Jay and Estep, acting in concert, accomplished the impermissible goal of unlawfully arresting

43

Hinkle without probable cause." Appellant's Opening Br. 39 (emphasis and capitalization removed).

For a valid § 1983 conspiracy claim, plaintiffs "must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient." *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990) (internal quotations omitted) (quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990)). We understand Hinkle to premise this conspiracy claim on his false-arrest allegations. As we have concluded, Hinkle has not shown a false arrest; therefore, the conspiracy claim was properly dismissed.

## VI.    Hinkle's Fourth Amendment Strip-Search Claim[21]

We next address whether Hinkle's body-cavity strip search was reasonable under the Fourth Amendment. To answer this question, the parties direct us primarily to *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012). So first, we begin by reviewing the scope of the Court's ruling in *Florence*. Second, we analyze whether *Florence* sanctions Hinkle's body-cavity strip search. Third, because we conclude that it does not, we will consider whether the body-cavity strip search was

---

[21] As mentioned, Hinkle has not raised on appeal a retaliation claim based on the strip search. *See* s*upra* note 16 and accompanying text. Further, the strip-search claim that Hinkle has raised on appeal is limited to the County. *See* Appellant's Opening Br. 24 ("Accordingly, the trial court's summary judgment regarding the strip search should be reversed and claim be allowed to proceed against the County."). The district court explained in its summary-judgment order that Hinkle's "unconstitutional-strip-search claim against [the] individual defendants" was not before the court at that time, because "it was previously dismissed by Judge Miles-LaGrange prior to transfer of the case[.]" Appellant's App. vol. 6 at 1422. Hinkle has not appealed that earlier order or claimed that it was in error.

44

otherwise reasonable under the Fourth Amendment. Fourth, after concluding that the strip search was unreasonable, we will analyze whether Hinkle can establish *Monell* liability against the County.

### A.    *Florence v. Board of Chosen Freeholders*

In 2005, Albert Florence was stopped by a New Jersey state trooper. *Florence*, 566 U.S. at 323. During the stop, the trooper learned of an outstanding 2003 bench warrant. Unknown to the trooper, the warrant had mistakenly remained active in a law-enforcement database despite Florence's having paid the underlying fine. *Id.* The trooper arrested Florence and took him to the Burlington County Detention Center, where "every arrestee" was required "to shower with a delousing agent." *Id.* Per the jail's policy, as arrestees showered, officers checked their bodies "for scars, marks, gang tattoos, and contraband[.]" *Id.* After being subjected to this procedure, Florence was "instructed to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals." *Id.* At Burlington, Florence "shared a cell with at least one other person and interacted with other inmates following his admission to the jail." *Id.*

After six days in the Burlington County jail, Florence was transferred to the Essex County Correctional Facility, where "all arriving detainees passed through a metal detector and waited in a group holding cell for a more thorough search." *Id.* at 324. During that second search, detention officers examined each detainee's "ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits, and other body openings." *Id.* To search "other body openings," the detention officers required Florence "to lift his genitals, turn around, and cough in a squatting position as part of the process." *Id.*

45

The detention officers searched Florence's clothes while he showered. *Id.* After all this was done, the detention officers placed Florence in the prison's general population. *See id.* A day later, the charges against him were dismissed. *Id.* at 324.

Florence sued under § 1983, claiming that "persons arrested for a minor offense could not be required to remove their clothing and expose the most private areas of their bodies to close visual inspection as a routine part of the intake process." *Id.* Rather, Florence argued, corrections officials needed reasonable suspicion that a detainee was smuggling contraband. *Id.* The Third Circuit rejected any need for a reasonable-suspicion showing, ruling that the procedure reasonably balanced inmate privacy and the two jails' security requirements. *Id.* at 325 (citing *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296, 311 (3d Cir. 2010)). The Supreme Court granted certiorari to resolve a circuit split on the question whether officers need at least reasonable suspicion to strip search detainees. *Id.* at 325–36 (citation omitted) (noting that seven circuit courts of appeals required reasonable suspicion, while three did not).[22]

The Supreme Court began its analysis by reciting the overarching principle that "[c]orrectional officials have a significant interest in conducting a thorough search as a standard part of the intake process." *Id.* at 330. The Court derived this interest from at least four concerns: (1) the possibility that new detainees will bring

---

[22] The Tenth Circuit was one of the seven circuits that required reasonable suspicion. *See, e.g.*, *Archuleta v. Wagner*, 523 F.3d 1278, 1285 (10th Cir. 2008); *Warner v. Grand Cty.*, 57 F.3d 962, 964 (10th Cir. 1995); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984).

lice or diseases into the facility, (2) the possibility that new detainees will have wounds that need medical attention, (3) the growing number of gang members who are entering detention facilities and the need to identify who they may be, and (4) the need to detect contraband. *Id.* at 330–33. And the Court noted that these concerns are not just limited to large prisons: "Jails can be even more dangerous than prisons because officials there know so little about the people they admit at the outset." *Id.* at 336 (citation omitted).

In view of these concerns, the Court declared that "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Id.* at 332–33. In other words, because prison officials have certain expertise that judges lack, the Court stressed that the judiciary must give prison officials considerable discretion before disturbing their policies. *Id.* at 326. This means that "a regulation impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." *Id.* (internal quotation marks omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Only when plaintiffs show "substantial evidence in the record to indicate that the officials have exaggerated their response to [legitimate security interests]" should courts refuse to defer to prisons. *Id.* at 328 (internal quotation marks omitted) (first quoting *Block v. Rutherford*, 468 U.S. 576, 584–85 (1984); then quoting *Bell v. Wolfish*, 441 U.S. 520, 548 (1979)).

Citing a need for "readily administrable rules," the Court concluded that regardless of a detainee's "suspected offense, criminal history, [or] other factors," policies requiring strip searches of all incoming detainees who will be admitted into the general population pass constitutional scrutiny. *Id.* at 338–39 (citation omitted). Requiring that prison officials consider the individual characteristics of each detainee would be too onerous, the Court reasoned, because "[officials] would be required, in a few minutes, to determine whether any of [their] underlying offenses were serious enough to authorize the more invasive search protocol." *Id.* at 337.[23] This would negatively affect "[t]he laborious administration of prisons." *Id.*

Thus, the Court ruled against Florence and concluded that he had suffered no constitutional deprivation. *Id.* at 339–40. By sanctioning the policies at the Burlington County Detention Center and the Essex County Correctional Facility, the Court followed the course it set in *Bell*, 441 U.S. 520. In *Bell*, the Court upheld indiscriminate strip-search practices requiring all Metropolitan Correctional Center inmates to undergo body-cavity searches after their contact visits with outsiders,

---

[23] The Court rejected Florence's reasonable-suspicion argument on this ground, concluding that "[t]he laborious administration of prisons would become less effective, and likely less fair and evenhanded, were the practical problems inevitable from the rules suggested by petitioner to be imposed as a constitutional mandate." *Florence*, 566 U.S. at 337. If *Florence* does apply, Hinkle accepts that the reasonable-suspicion standard plays no role here.

48

despite the record reflecting only "one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution." *Id.* at 558–60.[24]

In applying *Florence*, we must remember (1) that Florence was arrested on a bench warrant, and (2) that the Court recognized that judicial deference to strip searches might well lessen in other circumstances.[25] In light of these factors, the Court recognized that *Florence* extends only so far. For instance, in Part IV of the opinion (joined by three other Justices), Justice Kennedy identified possible future exceptions from the Court's ruling. 566 U.S. at 338–39.[26] First, he acknowledged that "[t]his case does not require the Court to rule on the types of searches that would be

---

[24] The Supreme Court reaffirmed its commitment to *Florence*'s underlying principles in *Maryland v. King*, 569 U.S. 435 (2013). There, the Court ruled "that DNA identification [through cheek swabs] of arrestees is a reasonable search that can be considered part of a routine booking procedure." *Id.* at 465. Relying on *Florence*, the *King* Court noted that routine prison procedures are needed to identify a detainee "when processing him for detention" and for protecting staff, other detainees, and the "new detainee." *Id.* at 450, 452 (internal quotation marks omitted) (quoting *Florence*, 566 U.S. at 330).

[25] We review the Court's discussion of these exceptions and the concurring opinions' elaborations on the exceptions only to provide a complete overview of *Florence*; we do not contend that these exceptions to *Florence*'s general rule apply here. Rather, because jail officials never decided that Hinkle would be housed in the BCDC's general population, *Florence*'s general rule itself does not apply here—meaning Hinkle has no need of an exception to it. *See discussion infra* Section VI.B.

[26] Justice Thomas did not join Part IV of Justice Kennedy's opinion. *Florence*, 566 U.S. at 321 n.1. Because Justice Thomas did not write separately, it is unclear whether he objected to Justice Kennedy's discussion of a possible exception from *Florence* under facts that were not before the Court, or whether he objected to the notion that *Florence* should have any exception whatsoever.

reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees."[27] *Id.* at 338–39. After doing so, he identified a possible two-part exception from *Florence*'s general rule concerning "whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here." *See id* at 339. Second, he noted that "there also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees," but he explained that Florence had raised no such issues. *Id.* at 325, 339.[28]

---

[27] Justice Kennedy described this situation as the one arising in *Atwater v. City of Lago Vista*, 532 U.S. 318, 338–39 (2001), which was not itself a strip-search case. *See Florence*, 566 U.S. at 338–39. In *Atwater*, a Texas police officer arrested a mother for operating a vehicle without having fastened her children's seatbelts. 532 U.S. at 323–24. Taken from her children, Ms. Atwater was booked and housed alone at the jail "for about one hour, after which she was taken before a magistrate and released on $310 bond." *Id.* at 324. The Court deemed her warrantless arrest reasonable under the Fourth Amendment. *Id.* at 354. But in *Florence*, Justice Kennedy raised *Atwater* three separate times, noting that Ms. Atwater had been segregated and taken to a magistrate. *See* 566 U.S. at 329–30, 337–39 (citing *Atwater*, 532 U.S. at 324). He noted that "[t]he accommodations provided in these situations [referencing *Atwater*] may diminish the need to conduct some aspects of the searches at issue." *Id.* at 339.

[28] Hinkle bases his beard-touching claim on this exception, and the district court dismissed the claim after concluding that Hinkle had not met this exception. But we liken Officer Atwood's touching of Hinkle's beard to check for contraband to a continuation of the initial pat-down frisk. Importantly, this frisk differs from the far-more-invasive touching of a detainee's unclothed body as part of a strip search, especially as part of an inspection of body-cavities. Because Hinkle bases his beard-touching claim on an unconstitutional strip search—not an unconstitutional pat-

Two of the majority's five Justices filed concurring opinions addressing the reach of the Court's holding. First, Chief Justice Roberts noted that "it is important for me that the Court does not foreclose the possibility of an exception to the rule it announces." *Id.* at 340 (Roberts, C.J., concurring). He limited *Florence* to its circumstances—"the facts that Florence was detained not for a minor traffic offense but instead pursuant to a warrant for his arrest, and that there was apparently no alternative, if Florence were to be detained, to holding him in the general jail population." *Id.* To avoid "embarrass[ing] the future," Chief Justice Roberts noted that the Court was "wise to leave open the possibility of exceptions." *Id.*

Second, Justice Alito considered it important "that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* at 341 (Alito, J., concurring). He then emphasized that "[t]he Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer." *Id.* at 342.[29]

_____

down—we conclude that the district court properly dismissed this claim. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." (citations omitted)).

[29] Joined by three other Justices, Justice Breyer dissented, reasoning that a body-cavity strip search "of an individual arrested for a minor offense that does not involve drugs or violence . . . is an 'unreasonable searc[h]' forbidden by the Fourth

He singled out arrestees who are likely to be released by a magistrate on their own recognizance or on minimal bail, and declared that it might not be reasonable to admit them "to the general jail population, with the concomitant humiliation of a strip search," "particularly if an alternative procedure is feasible." *Id.* at 341–42.

**B.**     ***Florence* Does Not Sanction the County's Policy of Body-Cavity Strip Searching All Detainees Before Deciding Whether Particular Detainees "Will Be" Housed in the Jail's General Population.**

Sheriff Jay testified that he was "the final policy maker for the sheriff's department" and that the County's policy was to body-cavity strip search every detainee arriving at its jail. Appellant's App. vol. 2 at 218–19; *id.* at 284 ("By policy, everyone that's booked into the Beckham County Jail is strip searched.").[30] Sheriff Jay had authority to implement this policy because, as he explained, "everybody in Beckham County Sheriff's Department answers to [him]" and "the buck stops with [him]." *Id.* at 218. And the record demonstrates that the jailers enforced the County's policy.

---

Amendment, unless prison authorities have reasonable suspicion to believe that the individual possesses drugs or other contraband." *Florence*, 566 U.S. at 343–44 (Breyer, J., dissenting) (alteration in original). Because four Justices criticized the absence of reasonable suspicion from *Florence*'s general rule, it seems a fair surmise that these Justices would, at the very least, support robust exceptions in future cases.

[30] Even though Sheriff Jay explained that the jailers strip searched pre-trial detainees under the County's "policy," we conclude that his and the other witnesses' testimony (as we discuss next) also suffice to establish that the County had a custom of performing indiscriminate strip searches. *See Murphy*, 950 F.3d at 644 (explaining that a custom is "a 'widespread practice that, although not authorized by a written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law'" (quoting *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010))).

For instance, Detention Officer Atwood testified that the "standard [intake] process" at the BCDC involved strip searching a detainee before booking. *Id.* at 339. He explained that "every inmate [who] comes into the jail gets [strip] searched" and that, after the strip search, detainees would be brought into the booking room to acquire "their basic information." *Id.* at 332–34, 336. From his year's employment as a jailer at the BCDC, Officer Atwood could never recall "a time where the strip search happened after the booking process had begun." *Id.* at 320, 340. In fact, Officer Atwood stated that jailers strip searched detainees before receiving from the arresting officer a custody-authorization form, which describes the detainee's "personal information and his charges." Appellant's App. vol. 4 at 908–09. And because jailers strip searched detainees before knowing their personal information or charges, Officer Atwood confirmed that jailers postponed making housing decisions until the booking process after the strip search: when asked what he would know about "an inmate's eventual cell placement at the time that [he was] strip searching an inmate," Officer Atwood testified that he "wouldn't know where that inmate's going to be housed." Appellant's App. vol. 2 at 341. In other words, until he had received "a chance to look at [the detainee's] charges" and personal information during the booking process, Officer Atwood testified he "wouldn't know exactly

53

where [the detainee is] going." *Id.*[31] Officer Atwood explained that this "standardized

intake process" did not "vary according to inmates[.]" *Id.* at 340.[32]

Further, Captain Diana Bilbo, "the captain in charge of the jail," testified that

she never had occasion to "discipline Jason Atwood for the way that he conducted a

strip search[.]" *Id.* at 361, 370. When asked whether "the standard operating

procedure was to strip search everybody [who] came in," Captain Bilbo said, "Yes."

*Id.* at 365.[33] Corroborating Officer Atwood's testimony that jailers would not know a

detainee's charges or personal information before the strip search (and by extension,

would be unable to determine a detainee's housing designation), Captain Bilbo noted

that it was "consistent with [her] experience" that arresting officers would not

provide to jailers a completed custody-authorization form until after the strip search.

Appellant's App. vol. 4 at 912.

---

[31] In addition, Officer Atwood testified that he would "would not have begun to type in the information into the booking information category until after Hinkle had been strip searched." Appellant's App. vol. 2 at 341. The "booking information category" is a heading on Hinkle's booking-sheet form. Under that heading, the jailers typed in the word "SEGREGATION" after the strip search. *Id.* at 316.

[32] Officer Atwood did say that "if there's another detention deputy in there," one deputy "start[s] th[e] book-in process while the other one's conducting the strip search." Appellant's App. vol. 2 at 340.

[33] Deputy Brett Moore, who stopped Hinkle's automobile before the arrest, testified that he was "aware that all the prisoners [he] brought in were strip searched," agreeing that "[e]ven the ones that were going to be put in segregation" were strip searched. Appellant's App. vol. 1 at 172–73.

In its briefing, the County acknowledges that by its policy "[j]ailers strip searched incoming inmates at the very beginning of the booking process, before sitting down at the desk to begin the booking paperwork and before knowing where the inmate would be housed in the facility."[34] Appellee Beckham Cty. Bd. of Cty. Comm'rs Resp. Br. 4–5. And it acknowledges that its policy was "to strip search all detainees." *Id.* at 10 (emphasis and capitalization removed).

In strip searching Hinkle, the BCDC's jailers enforced this policy. Hinkle testified that on self-reporting to the jail, he was immediately strip searched, was booked, and was handcuffed to a bench in the booking area for about an hour until being transported to the Elk City jail. When questioned about why Hinkle was handcuffed to the bench and "what may have been taking place," Captain Bilbo explained that as arising from their not yet having "made a decision on where he was going to be housed." Appellant's App. vol. 2 at 367.[35] The County confirms that "at the time [Hinkle] was strip searched, there had been no determination made regarding how [Hinkle] was going to be classified or where he would be housed." Appellee Beckham Cty. Bd. of Cty. Comm'rs Resp. Br. 4.

---

[34] The record contains a four-page 2006 strip-search policy, but the County neither discusses this policy, nor recites its requirements, nor mentions its relevancy. And the policy had succumbed to later legal developments and was not the same policy in force when Deputy Atwood body-cavity strip searched Hinkle.

[35] As discussed, Officer Atwood testified that Captain Bilbo made the decision to transfer Hinkle and that she may have known "ahead of time that he was coming in." Appellant's App. vol. 2 at 327. But Captain Bilbo was then "on medical leave." *Id.* at 366.

Under *Florence*, the jail could (1) decide that Hinkle "will be" housed in the jail's general population, and (2) then strip search him before placing him in the general population. *See* 566 U.S. at 322. Here, the County did not decide that Hinkle "will be" placed in the jail's general population, in fact just the opposite. By acting as it did, the County set the cart before the horse—it strip searched Hinkle before committing itself to admit him into its jail's general population. In *Florence*, the Court repeatedly stressed that the strip search comes after the facility determines that the detainee "will be" placed in general population. *Id.* (explaining that "the controversy [in *Florence*] concern[ed] whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed"); *id.* at 325–26 (explaining again that "[the] Court granted certiorari to address" "whether the Fourth Amendment requires correctional officials to exempt some detainees who will be admitted to a jail's general population from the searches here at issue"); *id.* at 335 ("Reasonable correctional officials could conclude these uncertainties [about whether a particular detainee is dangerous] mean they must conduct the same thorough search of everyone who will be admitted to their facilities."); *id.* at 338 (accepting the jail officials' argument that "the Constitution must not prevent [detention officials] from conducting [strip searches] on any suspected offender who will be admitted to the general population in their facilities"); *id.* at 338–39 (explaining the limits of *Florence*'s ruling and commenting that "[t]his case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without

assignment to the general jail population and without substantial contact with other detainees").[36] In other words, the "will be" condition precedes the strip search, which itself precedes placing the detainee in the jail's general population.[37] And the Court's "will be" condition to strip searches makes perfect sense—absent admitting the detainee to the jail's general population, the jail would have no need to protect the new detainee, the existing detainee population, and the detention staff from infectious diseases, rival gang members, weapons, or contraband. *Id.* at 330–33. These strip-search justifications were absent here: when the jailers referenced a housing decision on the form, they notated segregation.

We would reject any argument that the County—for administrative convenience—could treat all its incoming detainees as bound for its jail's general population, thus allowing universal strip searches.[38] Body-cavity strip searches are not so trivial. And had the County tried to claim that before the strip search it had

---

[36] One of the five majority Justices, Justice Alito, states the "will be" condition in slightly different language: "The Court holds that jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches not involving physical contact by corrections officers." *Florence*, 566 U.S. at 340 (Alito, J., concurring).

[37] During the strip search, detention officers may learn things requiring the detainee be segregated and not placed in the facility's general population—for instance, the presence of an infectious disease or tattoos with gang insignia. *See Florence*, 566 U.S. at 330–33.

[38] In *Hill*, we "agree[d]" that "[a]n indiscriminate strip search policy routinely applied to detainees . . . cannot be constitutionally justified simply on the basis of administrative ease." 735 F.2d at 394 (internal quotation marks omitted) (quoting *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981)).

strayed from its policy and determined that Hinkle "will be" housed with its jail's general population—which to its credit it does not claim—that would have won it nothing. After all, jail officials segregated Hinkle from the jail's general population after the strip search, because it declined to house a former local law-enforcement officer in its jail. That led the County to transport Hinkle to Elk City.[39]

If we were to accept the County's argument and conclude that *Florence* permits jail policies by which detainees are first strip searched and later sorted out for jail-housing placement, we would render *Florence*'s general-population condition meaningless. *Florence* does not sanction such a policy—strip searching detainees not destined for the jail's general population, or even as here, for the jail itself. *See Fonder v. Sheriff of Kankakee Cty.*, 823 F.3d 1144, 1146 (7th Cir. 2016) (concluding that under *Florence*, two class-action plaintiffs "ha[d] good claims that their rights have been violated" if they had been "arrested, strip searched, and then immediately released"). We therefore conclude that *Florence* does not protect the County's policy.[40]

---

[39] Assuming that segregation truly was unavailable at the BCDC, we presume that this must mean that detainees were always transported to Elk City whenever they required segregation.

[40] Under *Florence*, the County could properly maintain a strip-search policy allowing strip searches after jailers have decided that a detainee "will be" admitted to general population. A facility's safe course is to strip search the detainee as the last step before admitting him or her into the facility's general population.

### C. Hinkle's Body-Cavity Strip Search Was Unreasonable Under the Fourth Amendment, and the County, by Its Policy, Is Responsible.

#### 1. Hinkle's strip search was unreasonable.

Having concluded that *Florence* does not authorize the County's strip-search policy, we must still decide whether Hinkle suffered an unreasonable search under the Fourth Amendment. The district court did not reach that issue, concluding that this case "fits within *Florence*." Appellant's App. vol. 6 at 1425. The County follows suit, largely resting its case on *Florence*. With *Florence* not sanctioning his body-cavity strip search, we must determine what legal standard governs Hinkle's strip search. Hinkle argues that we should use our circuit's pre-*Florence* strip-search cases to determine the Fourth Amendment reasonableness of his strip search. He contends that those cases bar "indiscriminate strip searches of pre-trial detainees." Appellant's Opening Br. 22. Indeed, those cases required reasonable suspicion of contraband, including weapons, before permitting a strip search. *See, e.g.*, *Archuleta v. Wagner*, 523 F.3d 1278, 1285 (10th Cir. 2008) ("[W]hether a strip search is permissible is a separate inquiry based on whether a detainee will be placed in the general prison population and whether the officer has reasonable suspicion that a detainee has hidden drugs, contraband, or weapons." (citations omitted)); *Warner v. Grand County*, 57 F.3d 962, 964 (10th Cir. 1995) ("On [January 24, 1991], it was clearly established in this circuit that a brief intermingling with the general jail population does not justify a strip search absent reasonable suspicion of drugs or contraband." (citation omitted)); *Cottrell v. Kaysville City*, 994 F.2d 730, 732, 734–36 (10th Cir.

59

1993) (per curiam) (concluding that a body-cavity search of a detainee who was not "held with any other prisoners" was unreasonable when the arresting officer testified that "he did not suspect Ms. Cottrell of having drugs on her person" and "saw no indication she was carrying any weapons"); *Hill v. Bogans*, 735 F.2d 391, 392, 394 (10th Cir. 1984) (concluding that a strip search of a traffic offender who "was briefly intermingled with the prison population" was unconstitutional because "[t]here were no circumstances . . . indicating that [he] might possess either a weapon or drugs").[41]

But because the jail officials never decided that Hinkle "will be" housed at the county jail, no one had any reason to fear that Hinkle might have secreted contraband that he could take into the jail's general population. In this circumstance, even our pre-*Florence* cases do not apply—they too concerned the problem of detainees taking contraband into the general population. But for detainees like Hinkle who will not be housed in the jail's general population, the County needs far more to justify a body-cavity strip search—probable cause that detainee is secreting evidence of a crime. *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1447–49 (9th Cir. 1991) (holding that outside of the "jail context," detainees "may only be subjected to [body-cavity searches] if

---

[41] *Archuleta*, *Warner*, and *Hill* were not body-cavity strip search cases. *Archuleta*, 523 F.3d at 1282; *Warner*, 57 F.3d at 963; *Hill*, 735 F.2d at 393–94. Thus, Hinkle's search was more invasive. We view Hinkle's search as comparable to the body-cavity search in *Cottrell*, during which the plaintiff was "required to take off all her clothes and bend over while the deputies inspected her." 994 F.2d at 732. We have characterized such body-cavity searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive[.]" *Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986) (internal quotation marks omitted) (quoting *Blackburn v. Snow*, 771 F.2d 556, 564 (1st Cir. 1985)).

60

there is probable cause to believe that [they] ha[ve] secreted the item sought in a body cavity"). The County has not argued that it ever had such probable cause.[42] Thus, we conclude that Hinkle was subjected to an unlawful strip search.

### 2. *Monell* **Liability**

Before the County can be held liable for Hinkle's unlawful strip search, Hinkle must show that by enforcing the County's policy an employee caused the Fourth Amendment violation. *Monell*, 436 U.S. at 694; *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (noting that the policy or custom must be the "moving force [behind] the constitutional violation" (alteration in original) (internal quotation marks and citations omitted)). Specifically, Hinkle "must prove '(1) official policy or custom[,] (2) causation, and (3) state of mind.'" *Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019) (alteration in original) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)).

We have recognized as policies meeting this standard those arising from "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017) (citing

---

[42] Nor has the County argued that Officer Atwood had reasonable suspicion that Hinkle—whose alleged wrong was possessing a stolen trailer—was secreting contraband. So even if our pre-*Florence* cases applied, the County could not prevail under them.

61

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)). Here, the testimony from Sheriff Jay, Captain Bilbo, and Detention Officer Atwood, together with the County's own description of its policy, demonstrate that the County had a policy of strip searching all detainees before making housing decisions. With this, Hinkle has sufficiently shown the County's policy and, thus, has satisfied the first element.[43]

For the causation and state-of-mind elements, Hinkle can satisfy his burden by demonstrating that the County's policy is facially unlawful. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." (citation omitted)). The Court has explained that "[w]here a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). A county's sanctioning of a facially unlawful policy establishes that it "was the moving force behind the injury of which the plaintiff complains." *Id.* at 405; *see also Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) ("Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation will most likely occur."). Further,

---

[43] The County does not protest that Sheriff Jay had final policymaking authority to formulate the BCDC's strip-search procedures.

"proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Brown*, 520 U.S. at 405.

Thus, the next issue is whether the County's policy is facially unconstitutional. "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019).[44] Apart from its failed *Florence* argument, the County advances no argument denying that the policy is unconstitutional in all its applications. Under *Florence*, jail officials must decide that a detainee "will be" housed in the general population before strip searching him or her. And here, the County's strip-search policy permits strip searches before the key moment in which the jail official with authority decides that the detainee "will be" housed in the general population. So in enforcing the County's strip-search policy, jail officials strip search all detainees before reaching the operative decision of whether the detainee will be housed in the general population. For these reasons, we conclude that the County's strip-search policy is

---

[44] The "official policy" at issue in *Monell* is an example of a facially unlawful policy. The complaint there alleged that the policy "compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons." 436 U.S. at 660–61; *see also Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) ("*Monell* involved an express municipal policy alleged to violate due process and equal protection limitations—a requirement that pregnant employees take unpaid leave from their city jobs while still willing and able to work."). An "official policy of sexually harassing, assaulting, or discriminating against women prisoners" would be a second example of a facially unlawful policy. *See Barney*, 143 F.3d at 1307.

unconstitutional on its face. And with this, Hinkle has satisfied the causation and state-of-mind elements.

Moreover, even if the County's policy were facially constitutional, Hinkle would still satisfy the causation and state-of-mind elements. For causation, we have explained that "the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider*, 717 F.3d at 770 (quoting Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.12[B] (2013)). This requires "a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. When a policy is facially constitutional, the burden of establishing causation (and culpability) is heavy. *Id.* at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." (citations omitted)).

Hinkle meets that heavy burden. By the terms of the County's policy, "[j]ailers strip searched incoming inmates at the very beginning of the booking process, before sitting down at the desk to begin the booking paperwork and before knowing where the inmate would be housed." Appellee Beckham Cty. Bd. of Cty. Comm'rs Resp. Br. 4–5. Thus, the County's policy directs jailers to immediately strip search the detainees. By enforcing the policy, Officer Atwood caused Hinkle's unlawful strip search. Because the jail transported Hinkle to Elk City for detention, Hinkle obviously could not have smuggled contraband into the BCDC's general population.

64

Thus, but for the County's policy—specifically, the sequence of performing strip searches before making final housing decisions—Hinkle would never have been unlawfully strip searched.

Finally, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407 (quoting *City of Canton*, 489 U.S. at 388). We have explained that "[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (internal quotation marks omitted) (quoting *Barney*, 143 F.3d at 1307). While typically notice is "established by proving the existence of a pattern of tortious conduct," it can also be established "in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* (internal quotation marks omitted) (quoting *Barney*, 143 F.3d at 1307–08).

For instance, in *Allen v. Muskogee*, 119 F.3d 837, 845 (10th Cir. 1997), this court concluded that a plaintiff's claim came "within the 'narrow range of circumstances' recognized by *Canton* and left intact by *Brown*, under which a single violation of federal rights may be a highly predictable consequence [of a

65

municipality's action or inaction]." There, the summary-judgment record "support[ed] an inference that the City trained its officers to leave cover and approach armed suicidal, emotionally disturbed persons and to try to disarm them[.]" *Id.* at 843. After participating in this training, police officers approached Terry Allen's vehicle—where a suicidal and armed Allen sat with a leg out the window— and attempted to wrestle his gun from him. *Id.* at 839. In the end, "shots were exchanged," and Allen was hit four times and killed. *Id.* Because "officers will frequently have to deal with armed emotionally upset persons" and the City's training amplified the possibility "of a violent response," we concluded that "the City's failure to properly train its officers reflected deliberate indifference to the obvious consequence of the City's choice." *Id.* at 845.

Likewise, the County's policy here reflects a deliberate indifference to the obvious consequences of its decision to strip search all detainees before making final housing assignments. Proceeding as if all inmates will be housed in the general population of the jail overlooks the reality that some detainees will not be placed in the jail's general population—for example, former local police chiefs. Yet the County strip searches all detainees, ignoring that any number of reasons might necessitate that a particular detainee be segregated. Accordingly, even though Hinkle has not pointed out a pattern of tortious conduct, we conclude that this case falls within the "narrow range of circumstances" in which it was "plainly obvious" that the County's policy of strip searching all detainees would result in a detainee being needlessly body-cavity strip searched.

66

In sum, we conclude that Hinkle was unlawfully strip searched because *Florence* does not authorize the County's policy and the search was otherwise unsupported by probable cause. Moreover, we conclude that the County's strip-search policy is facially unconstitutional because it directs jail officials to strip search all detainees immediately upon arrival at the jail, before determining they "will be" housed in its jail, and in the absence of probable cause that the detainees are secreting evidence of a crime. And even if the County's policy were facially constitutional, Hinkle could satisfy the causation and state-of-mind elements because the County's policy directly caused Hinkle's unlawful strip search and the County was deliberately indifferent as to the obvious effects of the policy. Before subjecting a detainee to the abject abasement of a body-cavity strip search, jail officials should first conclusively decide whether that detainee will be housed in their jail's general population.

## CONCLUSION

We affirm the district court's grant of summary judgment against Hinkle's § 1983 claims in all respects except its dismissal of Hinkle's strip-search claim. We reverse the district court's grant of summary judgment on that claim and remand for further proceedings consistent with this opinion.

18-6202, *Hinkle v. Beckham County Board of Commissioners*
**TYMKOVICH**, Chief Judge, dissenting in part.

I disagree with the majority opinion's conclusion that a reasonably objective police officer would believe that probable cause existed to make a warrantless arrest of Mr. Hinkle. Even if probable cause arguably existed at some point during the investigation, I would conclude it dissipated upon Deputy Estep's pre-arrest exchanges with Mr. Hinkle and Mr. Keown, which established the latter owned the suspect trailer.

The majority opinion sets forth the series of compounding errors that gave rise to the arrest. Had Deputy Estep arrested Mr. Hinkle immediately upon their first face-to-face contact, it would have been a closer call. But Deputy Estep continued his investigation after having Mr. Hinkle detained at a traffic stop. At that point, he began an interview with Mr. Hinkle and, eventually, Mr. Keown. During these conversations, new information came to light—information that, in my view, dissipated the factual basis for Mr. Hinkle's warrantless arrest and demanded additional investigation.

We have observed that "probable cause becomes stale when new information received by the police nullifies information critical to the earlier probable cause determination." *United States v. Dalton*, 918 F.3d 1117, 1128 (10th Cir. 2019) (citing Wayne Lafave, *Search and Seizure* § 4.7(a) at 822 (5th ed. 2012)); *see also Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) (police "may not disregard facts tending to dissipate probable cause" in making arrests). I conclude the discussions between Deputy Estep, Mr. Hinkle, and Mr. Keown dissipated probable cause for Mr. Hinkle's arrest and compelled Deputy Estep to undertake further investigation.

During the course of their conversation, Mr. Hinkle informed Deputy Estep that—when they had earlier spoken via phone—he misunderstood which trailer Deputy Estep was referencing, and that he did not own the suspect trailer.[1] As he explained, Mr. Hinkle owned a *different* trailer that was parked elsewhere, and Mr. Keown owned the suspect trailer. Indeed, Mr. Hinkle repeatedly denied ownership of that trailer and affirmed that Mr. Keown had purchased it from the Carpenters Church in South Carolina. Deputy Estep, moreover, called Mr. Keown, who corroborated Mr. Hinkle's account and insisted the latter "had nothing to do with [the trailer]." Appellant's Appx. vol. 4 at 932.[2] *At that point*, even Deputy Estep acknowledged that an in-person interview with Mr. Keown was appropriate and the matter was "still under investigation." *Id*. at 934. Yet an arrest ensued, leading to incarceration and a strip search in the local jail.

At the very least, I would conclude these developments undermined a reasonable belief that probable cause existed, and created an obligation to investigate Mr. Hinkle's involvement more thoroughly before placing him under arrest. An objectively reasonable officer would have interviewed Mr. Keown or sought information regarding title and

---

[1] It is worth noting that Mr. Hinkle never affirmatively stated that he owned the suspect trailer. His vague response—"right"—to Deputy Estep's suggestion he did in their earlier phone call is a questionable basis for such a conclusion.

[2] Mr. Keown's statement that the trailer was "family property" is hopelessly vague in this context, given that Mr. Keown told Deputy Estep that Mr. Hinkle did not own the trailer. Without more, the mere fact that Mr. Keown and Mr. Hinkle were related by marriage does not support a reasonable belief that a conspiracy existed to conceal stolen property.

registration.[3] That Mr. Keown failed to meet Mr. Hinkle and Deputy Estep that night to resolve this misunderstanding does not undermine my conclusion. When coupled with his repeated assurances to the contrary, this failure to appear may well have given rise to renewed suspicions *regarding Mr. Keown*. But this behavior sheds no new light on the involvement—or lack thereof—of Mr. Hinkle, whose facially plausible explanation of the misunderstanding was corroborated by someone who stood to gain nothing by volunteering his ownership of the trailer.

I accordingly part ways with the majority opinion and conclude that Deputy Estep violated Mr. Hinkle's Fourth Amendment rights in deciding to arrest him subsequent to this exchange.

I also disagree with the majority's reversal of the strip search claim. For the reasons set forth by the district court I would affirm. The record shows that Mr. Hinkle would be placed in close proximity with other detainees and jail employees during the intake process, justifying a search for weapons or contraband.

For these reasons, I respectfully dissent.

---

[3] Deputy Estep told Mr. Hinkle after these exchanges, "If [Mr. Keown] says, comes up here and says it's his trailer, okay, and he paid for it, or whatever, all right, he wants to take the blame for it, that's all on him, okay." Appellant's Appx. vol. 4 at 937.