**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 19, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

PHILLIP MICHAEL ERAVI,

    Plaintiff - Appellant,

v.

CITY COMMISSION OF LAWRENCE,
KANSAS; MEAGAN SHIPLEY; AUSTIN
TWITE; GRANT FOSTER; DAVID
MCSHANE,

    Defendants - Appellees.

No. 25-3068
(D.C. No. 5:24-CV-04042-DDC-RES)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **EID**, and **CARSON**, Circuit Judges.
_____

Lawrence City Police Department ("Lawrence PD") officers arrested

Phillip Michael Eravi while he was filming at the scene of a police standoff with an

armed shooter.  He sued the arresting officers and their on-scene supervisor under

42 U.S.C. § 1983, alleging First and Fourth Amendment violations.  The district

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

court granted the officers' motion to dismiss on qualified immunity grounds.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A. *Factual Allegations*[1]

Plaintiff Eravi is a "well-known citizen journalist," who regularly observes and records law enforcement at crime scenes.  App. at 8.  He has a YouTube channel, Lawrence Accountability, "which audits and documents incidents related to the constitutionality of government employee conduct, such as a City of Lawrence staff, County prosecutors, and local law enforcement." *Id.* at 15.  His reporting is generally critical, focusing on government officials' alleged corruption and misconduct.

Defendants Austin Twite, Grant Foster, Meagan Shipley, and David McShane were all Lawrence PD officers (collectively "the Officers") when the alleged events occurred.  Several officers on scene were familiar with Mr. Eravi before this incident and fostered "animus and bias" against him.  *Id.* at 22.

---

[1] Because this case is on appeal from the grant of a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), we accept all well-pled factual allegations in the complaint as true and view them in the light most favorable to Mr. Eravi. *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021).

Mr. Eravi's complaint referenced information from Lawrence PD incident reports, screenshots from Mr. Eravi's own footage, screenshots from Lawrence PD body camera footage, and dialogue excerpts.  Although the complaint does not attach these materials, we accept as true Mr. Eravi's allegations as to their content.

2

1. **Heatherwood Drive Shooting**

On May 19, 2023, Lawrence PD "responded to a reported shoot-out between neighbors" on Heatherwood Drive, a street in "a populated residential neighborhood." *Id.* at 18. Responding officers learned the shooter had "fired[] several rounds at his neighbor" and "was inside the residence of 1951 Heatherwood Drive, refusing to exit and was armed with a handgun," and may have "access to an AR-15 type rifle." *Id.* at 19. The garage door and the door inside the garage leading into the residence were open. The officers understood "it was paramount that the opened garage door be covered at all times." *Id.* Lawrence PD parked an armored vehicle in the driveway and, using a loudspeaker, tried to persuade the shooter to give himself up. A standoff ensued.

An apartment building with a front yard and sidewalk was located directly across the street from the suspected shooter's residence. Police instructed Heatherwood Drive residents to shelter in place or evacuate the area.

2. **Mr. Eravi's Arrival on Scene**

Mr. Eravi arrived on Heatherwood Drive around 1:53 a.m., nearly three hours into the standoff. He approached from the south, walking north on Heatherwood Drive toward the suspect's house. Lawrence PD had parked marked police cars at street intersections on Heatherwood Drive to "block[] access to the area," *id.* at 10, 25, but the cars did not block the sidewalks to pedestrian traffic. "[N]o officers were present to instruct anyone from walking from the Southside Northward." *Id.* at 23.

3

No crime scene tape blocked off the area, no "visible, tangible, perimeter" existed, and nothing "indicated that foot traffic was no[t] permitted." *Id.* at 24.

Officers saw Mr. Eravi approaching the scene and filming on his phone. Officers McShane and Foster walked toward Mr. Eravi, shining their flashlights. The following exchange occurred (image taken from the complaint):

| | | |
|---|---|---|
| McShane | (00:29): | Hey. Stop right there. Gotcha. Watch that. |
| Eravi | (00:49): | Get your lights out of my eye. |
| McShane | (00:57): | No, come on. You can't be right here. |
| Eravi | (01:00): | What? |
| McShane | (01:00): | Who are you? |
| Eravi | (01:01): | There's no... |
| McShane | (01:02): | Come on. |
| Eravi | (01:02): | There's no lines. |
| McShane | (01:03): | Keep an eye on that for me. |

*Id.* at 32. Mr. Eravi continued walking toward the officers and the suspect's house.

Officers McShane and Foster met Mr. Eravi on the sidewalk in front of the apartment complex across the street from the suspect's house and the armored truck. "Mr. Eravi attempted to put distance between himself and the [Officers]" by walking toward the apartment complex and then turning north and walking through the apartment complex's yard. *Id.* at 34, 29. He then turned around and began to head back south.

The officers followed Mr. Eravi as he walked, and the following exchange

occurred (image taken from the complaint):

```
Eravi        (01:04):    Don't touch me.
McShane      (01:05):    If you want to walk, walk. But I have to cover you.
Let's go.
Eravi        (01:09):    You ain't got to cover me, man. I ain't nobody that
needs to be covered.
McShane      (01:16):    You live here?
Eravi        (01:16):    You need to leave me alone.
McShane      (01:19):    Come on. Just get inside if you live here.
Eravi        (01:20):    You need to leave me alone.
McShane      (01:21):    Sir, I need you to leave.
Eravi        (01:23):    You need to leave me alone.
McShane      (01:24):    I will. Just keep walking.
Eravi        (01:27):    I'm a free human being. You need to leave me
alone.
McShane      (01:27):    I agree. You are. Keep walking, please. Come on.
Eravi        (01:30):    Leave me alone.
McShane      (01:30):    I'll walk with you.
Eravi        (01:31):    Leave me alone.
McShane      (01:34):    I can't get him to move.
Eravi        (01:37):    You motherfuckers woke me up. Leave me alone.
You woke me up.
McShane      (01:39):    What's your name?
Eravi        (01:40):    You woke me up. You got me out here. Leave me
alone.
McShane      (01:42):    Okay. Come on.
Eravi        (01:43):    Get off me, dude.
```

*Id.* at 34-35.

The following image, taken from the complaint, shows Mr. Eravi's path.



*Id.* at 28-29. The green line reflects Mr. Eravi's initial approach. It turns yellow

where Officers McShane and Foster shined their flashlights at him. The red dot

shows where the Officers met Mr. Eravi in front of the apartment complex. The

yellow line then reflects Mr. Eravi's attempts to "put distance between himself" and

the officers, *id.* at 34, first walking toward the apartment building, then turning north

parallel to the apartment complex, and then turning around and walking south.

Mr. Eravi was arrested at the start of the red line.[2]

3. **Mr. Eravi's Arrest**

As Mr. Eravi turned south, Officer McShane informed Officer Shipley and

Lieutenant Mark Unruh that Mr. Eravi was behind the armored truck, that he could

---

[2] The complaint does not explain what the rest of the red line represents. The blue line indicates the arrival of a Sherriff's Office vehicle.

not get Mr. Eravi to move, and that Mr. Eravi "was not listening." *Id.* at 34, 37-38. Although still across the street from the suspect's house, Mr. Eravi was not directly behind the armored truck when Officer McShane spoke with Office Shipley and the Lieutenant.[3]

Officer Shipley told Officer McShane that Mr. Eravi "can't be right behind the armor" and to "just arrest him." *Id.* at 38. Lieutenant Unruh, who is not a defendant, instructed Officer McShane to "[g]o ahead and detain him." *Id.*

Officers McShane, Foster, and Twite "physically restrained Mr. Eravi," using techniques "to cause Mr. Eravi pain including body and neck restraints, bending of the wrists and twisting of Mr. Eravi's fingers." *Id.* at 45. Officer McShane eventually told Mr. Eravi he was arrested "for interfering." *Id.* at 47.

4. **Incident Reports**

Officers McShane, Foster, Twite, and several non-defendant officers filed incident reports documenting Mr. Eravi's arrest. Officer Shipley also "filed a signed and sworn Affidavit" to charge Mr. Eravi with criminal interference in violation of Kan. Stat. Ann. §§ 21-5904(a)(3) and 21-5904(b)(5)(A). App. at 49, 52.[4] Mr. Eravi

---

[3] The above image shows the armored truck in the shooter's driveway. It further shows that Mr. Eravi was across the street from the armored truck when the Officers confronted him and was in approximately the same position relative to the armored truck when officers arrested him.

[4] Mr. Eravi's criminal case is still pending. *See* Dkt., *Kansas v. Eravi*, No. DG-2023-CR-000525 (Douglas Cnty. Dist. Ct.) (pending as of 5/18/2026).

alleged the Officers' incident reports and Officer Shipley's affidavit contained false and misleading information used to justify his arrest and prosecute him.

## B. *Procedural History*

Mr. Eravi sued the Officers under 42 U.S.C. § 1983 for retaliatory arrest in violation of the First Amendment. He also claimed unlawful arrest, excessive force, failure to intervene, and malicious prosecution in violation of the Fourth Amendment.[5] The Officers moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing qualified immunity barred Mr. Eravi's claims.

The district court granted the Officers' motion. It concluded they were entitled to qualified immunity because Mr. Eravi's complaint failed to allege a plausible First or Fourth Amendment violation. Although the parties briefed the clearly established law prong of qualified immunity, the district court did not address it.

---

[5] Mr. Eravi also sued the City Commission of Lawrence under § 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). He does not challenge the district court's dismissal of his claims against the City on appeal. *See generally* Aplt. Br.

## II.  DISCUSSION

### A. *Scope of Appeal*

Although the district court dismissed all four claims against the Officers,

Mr. Eravi conceded at oral argument that he challenges only the dismissal of his

retaliatory arrest claim on appeal.  *See* Oral Arg. at 13:00-14:21.[6]

### B. *Legal Background*

### 1.  Standard of Review and Requirements to State a Claim

"We review de novo a district court's ruling on a motion to dismiss a

complaint because of qualified immunity."  *Irizarry v. Yehia*, 38 F.4th 1282, 1287

(10th Cir. 2022).  "To survive a motion to dismiss [for failure to state a claim], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A plausible claim

must include facts from which we may reasonably infer the defendant's liability."

*Frey v. Town of Jackson*, 41 F.4th 1223, 1232 (10th Cir. 2022).  In considering

whether a complaint states a plausible claim for relief, we accept all well-pled

---

[6] If not conceded, Mr. Eravi, due to inadequate briefing, waived any challenges to the dismissal of his other claims.  His brief does not identify the elements of those claims and does not identify any error.  *See United States v. Clay*, 148 F.4th 1181, 1201 (10th Cir. 2025) (holding an appellant's failure to "explain *why* the district court erred" and failure to "cite *any* authority" to support his arguments was "a textbook example of issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (quotations omitted)); *see also United States v. Martinez*, 92 F.4th 1213, 1265 (10th Cir. 2024) ("Our law is clear: The first task of an appellant is to explain to us why the district court's decision was wrong." (quotations omitted)).

allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Luethje v. Kyle*, 131 F.4th 1179, 1187 (10th Cir. 2025).

"[M]ere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "Accordingly, in examining a complaint under Rule 12(b)(6), we will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Waller v. City & Cnty. of Denv.*, 932 F.3d 1277, 1282 (10th Cir. 2019) (quotations omitted). "An allegation is conclusory if it states an inference without underlying facts or if it lacks any factual enhancement." *Frey*, 41 F.4th at 1233.

## 2. Section 1983 and Qualified Immunity

Section 1983 provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Irizarry*, 38 F.4th at 1287 (quotations omitted). "Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1301 (10th Cir. 2025) (quotations omitted). "That said, defendants

asserting qualified immunity on a Rule 12(b)(6) motion face a more challenging standard of review than would apply on summary judgment." *Id.* (quotations omitted).

A defendant's raising of qualified immunity "creates a presumption that the defendant is immune from suit." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quotations omitted). "To overcome this presumption, the plaintiff must show (1) the defendant's actions violated a constitutional or statutory right, and (2) that right was clearly established at the time of the defendant's complained-of conduct." *Id.* "We have discretion to consider the two parts of this test in the sequence we deem best in light of the circumstances in the particular case at hand." *Burke v. Pitts*, 157 F.4th 1326, 1337 (10th Cir. 2025) (quotations omitted). "[I]f the plaintiff fails to satisfy either prong, a court must grant qualified immunity." *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025).

a. *First Amendment retaliation*

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To state a First Amendment retaliation claim, a plaintiff must allege facts showing "(1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response

to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotations omitted).

"In addition to the three *Worrell* elements, a First Amendment retaliation claim based on a false arrest requires a separate 'threshold showing'—generally, a plaintiff must show a false arrest." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1227 (10th Cir. 2020) (quoting *Nieves*, 587 U.S. at 407-08).  To meet this requirement, the plaintiff "must plead and prove the absence of probable cause for the arrest." *Nieves*, 587 U.S. at 402.

"In reviewing 'whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Hinkle*, 962 F.3d at 1220 (10th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018)).  "Such facts amount to probable cause 'when [they] . . . are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Id.* (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007)).

b.  *Clearly established law*

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted).  "Constitutional rights are clearly established when Tenth Circuit or Supreme Court precedent *particularized to the case* at issue exists." *Works v. Byers*, 128 F.4th 1156, 1165-66 (10th Cir.

12

2025) (quotations omitted). While the precedent need not be "directly on point," it must have "placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Thus, we hold "a right is clearly established when our precedent encompasses materially similar conduct or applies with obvious clarity to the conduct at issue." *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022) (quotations omitted).

"In the context of a qualified immunity defense on an unlawful search or arrest claim, we ascertain whether a defendant violated clearly established law 'by asking whether there was arguable probable cause' for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Bledsoe v. Carreno*, 53 F.4th 589, 615 (10th Cir. 2022). We have applied this standard to claims of retaliatory arrest. *See Mocek v. City of Albuquerque*, 813 F.3d 912, 925-27 (10th Cir. 2015) (holding an officer "at least had arguable probable cause to arrest" the defendant, based on a reasonable but mistaken interpretation of New Mexico law, and was therefore entitled to qualified immunity); *see also Detreville v. Gurevich*, No. 24-1427, 2025 WL 1874587, at *6 (10th Cir. July 8, 2025) (unpublished) ("We agree with the circuits holding that when probable cause is lacking at prong one, arguable probable cause for an arrest entitles

13

a defendant to qualified immunity at prong two.").[7]  Thus, if officers have arguable

probable cause to arrest a suspect, the arrest does not violate clearly established law.

3.  **Kansas Criminal Interference Statute**

Kansas law prohibits interference with law enforcement by "knowingly

obstructing, resisting or opposing" a law enforcement officer "in the discharge of any

official duty."  Kan. Stat. Ann. § 21-5904(a)(3).  "The offense's elements are:  (1) an

identified law enforcement officer carrying out some official duty; (2) defendant

knowingly and willfully obstructed or opposed [the] officer; and (3) defendant knew

or should have known the person he opposed was a law enforcement officer."

*State v. Brown*, 387 P.3d 835, 848 (Kan. 2017) (quotations omitted).

To constitute criminal interference, the obstruction "must have substantially

hindered or increased the burden of the officer in carrying out his official duty."

*State v. Parker*, 690 P.2d 1353, 1362 (Kan. 1984).  Non-compliance with an officer's

orders may constitute obstruction.  *See State v. Jackson*, 401 P.3d 684 (Kan. Ct. App.

2017) ("[A] defendant's failure to comply with a lawful order provides probable

cause for an arrest on the charge of interference with law enforcement.")

(unpublished table decision); *see also United States v. Mosley*, 743 F.3d 1317,

1330-31 (10th Cir. 2014) (same).  "Acts that cause officers to worry about safety

substantially hinder an officer in carrying out his duties."

---

[7] We cite unpublished opinions in this order and judgment for their persuasive
value under Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

14

*United States v. Richardson*, No. 17-40036-01-DDC, 2017 WL 6619327, at *5 (D. Kan. Dec. 28, 2017) (citing *Brown*, 387 P.3d at 849).

## C. *Analysis*

We resolve this appeal at prong two of qualified immunity. Based on the complaint's allegations, the Officers at least had arguable probable cause to believe that Mr. Eravi was obstructing the discharge of their official duties in violation of Kan. Stat. Ann. § 21-5904(a)(3) by (1) disobeying orders and (2) creating safety issues. As explained above, because the Officers had arguable probable cause to arrest Mr. Eravi, they did not violate clearly established law. *See Mocek*, 813 F.3d at 925-27; *see also Detreville*, 2025 WL 1874587, at *6. Mr. Eravi thus has not plausibly alleged a clearly established First Amendment retaliatory arrest.

### 1. **Interference by Disobeying Orders**

The Officers arguably had an objectively reasonable belief that Mr. Eravi obstructed their official duties by disobeying lawful orders. According to the complaint, Officer McShane repeatedly told Mr. Eravi to leave the area. He told Mr. Eravi: "Stop right there," "You can't be right here," "I have to cover you," "Come on," "Just get inside if you live here," "I need you to leave," "Just keep walking," "Keep walking, please," and "I'll walk with you." App. at 32, 35. These statements belie Mr. Eravi's allegation that he was never given a command.

Mr. Eravi did not comply with Officer McShane's instructions. Despite Officer McShane's initial statements—"Stop right there" and "you can't be right here"—Mr. Eravi kept walking toward the suspected shooter's house.

15

Officer McShane then repeatedly told Mr. Eravi that he needed to leave, but Mr. Eravi "attempted to put distance between himself" and the Officers—swerving into the yard of the apartment complex and then continuing north toward the shooter's house. *Id.* at 34. Although Mr. Eravi alleged that he eventually turned south, a reasonable officer in Officer McShane's position could have interpreted Mr. Eravi's change in direction as an attempt to continue evading officers.

When Officer McShane asked Mr. Eravi to vacate the area around the suspected shooter's house, he was carrying out official duties to cover that area and ensure the safety of residents and citizens. *Id.* at 35 (Officer McShane: "If you want to walk, walk. But I have to cover you."). Mr. Eravi impeded these duties by diverting and distracting Officer McShane from securing the area and monitoring the shooter's house. It was objectively reasonable for Officer McShane to believe, even if mistaken, that Mr. Eravi's behavior interfered with the Lawrence PD's official duties. *See State v. Stubbs*, 570 P.3d 1209, 1216, 1225-26 (Kan. 2025) (upholding a defendant's conviction under § 21-5904(a)(3), where the defendant fled from a police officer after being commanded to "Stop!"); *see also State v. Wolf*, 569 P.3d 916 (Kan. Ct. App. 2025) (upholding a defendant's conviction under § 21-5904(a)(3), where she "ignored [an officer's] commands to stop" for approximately eight seconds) (unpublished table decision).

## 2. Interference by Creating Safety Issues

The Officers also arguably had an objectively reasonable belief that Mr. Eravi was creating safety issues. When the officers arrested Mr. Eravi, they were nearly

three hours into a standoff with an "active shooter," whom they believed to be armed with a high caliber firearm. App. at 17. The shooter's garage and its interior doors were open. Lawrence PD was negotiating with the suspect from an armored vehicle. Residents had been instructed to shelter in place, and police cars blocked entry onto Heatherwood Drive. A wandering Mr. Eravi presented a safety concern to himself and others.

The complaint itself acknowledged the "seriousness of the situation, and the danger that was present in the neighborhood at the time." *Id.* at 20. The allegations recognized that Mr. Eravi was in the potential line of fire. *See id.* ("Those residing in the apartment complex still remained directly in the line of fire from the suspect's residence."). Officers had to expend time and effort to address the safety concerns that Mr. Eravi presented—namely covering him and repeating their requests for him to leave the area. Having to deal with Mr. Eravi pulled the officers away from their other duties, including covering "the opened garage door . . . at all times," which hindered their ability to continue monitoring the scene. *Id.*[8]

The foregoing is sufficient to conclude the Officers had an objectively reasonable belief, even if mistaken, that Mr. Eravi's actions created safety issues that hindered the discharge of their duties. *See Brown*, 387 P.3d at 849-50 (upholding a defendant's conviction for interference where officers had "to engage in additional

---

[8] Mr. Eravi's allegation that "[n]o officers were distracted or hindered from performing any official duty by Mr. Eravi's presence," App. at 40 (quotations omitted), is conclusory, *see Waller*, 932 F.3d at 1282.

17

actions" to address the heightened safety concerns created by the defendant); *see also State v. Dake*, 404 P.3d 359 (Kan. Ct. App. 2017) (upholding a defendant's conviction for interference where the defendant's non-compliance "required [the officer] to engage in additional action to address the heightened safety concerns," like "tell[ing the defendant] again and again to stop and put down the gun") (unpublished table decision).

3. **Mr. Eravi's Counterarguments**

Mr. Eravi's arguments are unavailing.

First, he contends the district court failed to consider the screenshots in his complaint showing he was walking south and therefore complying with Officer McShane's orders when he was arrested. Aplt. Br. at 30-32, 37-39. But the complaint's factual allegations could support a reasonable officer's belief that Mr. Eravi was not following the orders to leave and was instead attempting to evade the Officers. Further, a reasonable officer would already have had arguable probable cause to believe Mr. Eravi had failed to comply with orders and had created a safety risk before he turned to walk south.

Second, Mr. Eravi asserts the district court ignored his allegation that Officer McShane's "statements were unclear, not imperatives, and that [Officer] McShane was actually telling Mr. Eravi he was free to film while [Officer] McShane acted as his escort." *Id.* at 31. We agree with the district court that "plaintiff's pleading makes clear that the officer didn't permit plaintiff to wander around the active shooter area or remain in proximity to the suspected shooter's

18

residence.  He wanted to clear plaintiff out of that space.  His admonitions to 'keep walking' sought to accomplish that end."  App. at 175.

Third, Mr. Eravi argues the district court failed to grapple with his allegation that Officer McShane falsely reported to Officer Shipley that Mr. Eravi was standing behind the armored truck and would not move.  *See* Aplt. Br. at 32-33, 37-38, 40.  But even if Officer McShane was mistaken about Mr. Eravi's location in relation to the armored car, he still had a reasonable objective belief that Mr. Eravi was interfering.

Fourth, Mr. Eravi takes issue with the district court's characterization of Heatherwood Drive as a "crime scene" and maintains that the apartment complex across the street from the shooter's house was a "public forum."  *See id.* at 43-46.  But the standoff with the shooter was a crime scene, and the Officers' arguable probable cause was based on Mr. Eravi's interference with their performing official crime scene duties.

\* \* \* \*

Because the Officers had arguable probable cause to believe Mr. Eravi was interfering, they were entitled to qualified immunity.  The district court did not err in granting the Officers' motion to dismiss Mr. Eravi's First Amendment retaliatory arrest claim.

## III. **CONCLUSION**

We affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge